Suffern, Surr.
The contest in this case covers *329 a considerable portion of time and an extended field of inquiry ; commencing about 1850 and ending with the life of the deceased. It involved minute inquiry into the making of two wills and several codicils by him, and the circumstances attending their execution, and also into the business life and social habits, and relations and domestic intercourse of the testator during a residence in this county of thirty years, as well as into his testamentary capacity, and fitness to make and execute such instrument and other dispositions of his property, between 1863 and up to within two days of his decease. The questions litigated in this controversy related mainly to the due execution of the propounded instruments ; and to the competency to make a legal testamentary disposition of considerable estate, amounting to $100,000 and upwards; and the freedom of the testator from imposition and undue influence by these against whom it is alleged to have been exerted before and pending the testamentary acts.
John Hancock emigrated to this country from Manchester, in England, about the year 1842, and settled in the city of Hew York. He was at the time married, and left his wife Mary Hancock in England, as difficulties existed between them which probably induced his removal to this country. He, however, provided her there with a home and livelihood for some time. The following year, without his knowledge, consent, or invitation, she also came to Hew York and boarded with a Mrs. Walsh, a sister of Hancock’s ; and after remaining about a year, returned to England, where she remained until her death, which took place in 1876. In all his subsequent life he never voluntarily spoke of his wife or marital relations, as they seemed unpleasant and distasteful to him, and he was always reticent upon the subject in presence of his most intimate friends, and annoyed when referred to. Soon after he came to Hew York .lie engaged in mercantile pursuits, as a *330 dealer in woolen goods, hosiery, and small wares at. various places ol! business in the city, and continued in business until about 1867, when he retired, having accumulated a moderate fortune. He never kept house, but>made his home at boarding-houses, and with his friends. Among the persons- with whom he lived was: Mrs. Hannah Thacher, a widow lady, who kept a boarding-house in Brooklyn, and subsequently, in Orange, New Jersey.
From the time of his retirement from business, and during the balance of his life, he devoted himself to the care and increase of his property, and his chief pleasure seemed to be in assisting those whom he loved and respected, and his chief solicitude as to the final disposition of his estate. He was a moral man, polite, and considerate of his associates and companions, social and friendly in his intercourse and habits, and, withal, a provident and prudent man. This is the estimate of his character, fairly deduced from the proofs on the trial in respect to him personally, and this character he maintained until advancing years, with their attendant disabilities, produced their effect upon not only his health, but upon his mind and disposition.. His solicitude as to the distribution and disposition of his property and estate manifested itself in a desire to carry out his plans and wishes in respect to it, and safely secure it to those who might be the designated objects of his bounty by some valid instrument of disposition which would withstand any attack. In pursuance of this desire he consulted many lawyers and retained them to draw wills. As early as 1865, Mr. Delavan, one of the counsel in this case, swears that he drew a will, and subsequently many—a dozen or more—were drawn by different counsel, some of which were executed and some not. In the language of a former legal adviser, “He had a mania for making wills.”
*331 About this time, 1868, his health began to fail, and subsequently it became seriously impaired. He was afflicted with various ailments and diseases, producing more or 'less disabling effects, which increased in complication and severity, and at last ended in his’ death on September 12, 1874.
On November 16,1869, while residing at Orange,- New Jersey, he executed a will in the city of New York, drawn by Judge Hull. In 1873, the judge swears that he drew another will, but whether executed by Mr. Hancock he could not remember. On January 2, 1874, while still residing at Orange, he executed a-will, drawn by his then legal adviser, Mr. James W. Field, a lawyer of that place; and on January 30, 1874, he executed a codicil to the will, drawn by the same counsel. On April 14, 1874, while at the house of John Swenarton, at Clarkstown, New York, he executed another and second codicil to this will, and while at the same place on July 1, 1874, he executed another and third codicil thereto, both of which were drawn by Mr. Walter H. Shupe, a lawyer, who resided a few miles distant from the residence of Mr. Swenarton, in the adjoining town of Ramapo. On September 10, 1874, while still at the residence of Mr. Swenarton, at Clarkstown, New York; he executed two powers, and what is called a letter of instructions, to said John Swenarton, which papers were also drawn by Mr. Shupe, as well as some assignments of stock. During the time he was at Mr. Swenarton’s he - caused to be drawn assignments of mortgages by a lawyer named Hopper and by Mr. Shupe to Mr. Swenarton and others. These papers comprise the wills, codicils and documents relating to the disposition of his estate and property, which were involved in the matter before the court. John Hancock died at the residence of John Swenarton, in Clarkstown, New York, on September 12,1874, in the seventy-fifth year of his age.
*332 On September 21, 1874, John Swenarton, an executor named in the second codicil to his will, filed a duly verified petition in this court, praying the probate of the will and codicils thereto annexed, of John Hancock, deceased, dated January 2, January 30, April 14 and July 1,1874, respectively, and in the order of exe-, cution, alleged to devise and bequeath real and personal estate. Such proceedings were thereupon had, that, on November 16 following, this matter came on to be heard, and the proponent and his co-executors appeared in person, and by Andrew Fallon, George S. Stitt, William H. Taggard and Walter H. Shupe, Esqrs., their proctors and counsel; and the following heirs, next of kin, and widow and legatees, Mary Han-, cock, widow, by Edward C. Deleyan, Esq., Charles M. Carpenter, by John Gf. H. Myers, Esq., Alexander Stewart Walsh, by Edwin G. Davis, Esq., Judge Hull and James W. Field, Esq.; the several societies men-, tioned in said will by Edgar Ketchum, Esq., and Hannah Tliacher and Josephine T. Lindsley by said James W. Field, Esq., and Judge Hull; and subsequently James M. Allen, by Chilion B. Allen, Esq., Judge Hull, and said James W. Field, Esq., their several proctors and counsel. By the will of January 2, 1874, the testator bequeaths about $90,000 in legacies of money and property to various relations, persons, and religious and charitable ^societies and institutions, in various sums, from $1,000 to $5,000, and the. residue of his estate to such benevolent and charitable objects as his executors shall in their' discretion agree upon, and appoints his friend John t Bell Locke, of Yonkers, N. Y., James M. Allen, of Newark, N. J., and Alexander Stewart Walsh, of Brooklyn, N. Y., executors thereof; and the subscribing witnesses thereto are James W. Field, Philip Kingsley, and Augustus E. Kissam. In and by the codicil thereto of January 30, 1874, he bequeaths to *333 Augustus Swenarton, son of John Swenarton, and Maria Hancock, each the sum of $5,000, which codicil is witnessed by James W. Field and Frank W. Baldwin.
The provisions of the will of 1869, drawn by Judge Hull, which was produced and proved on the trial, and marked as an exhibit, and of the will of 1873, which was not produced, but its contents, generally stated, were substantially the same as those in the will of 1874, now before the court; and it is noticeable that the intention of the testator as to the beneficiaries thereunder and the general character and amount of the legacies to them was so little changed, and so uniformly preserved, and that the testimony of various witnesses on the trial, as to declarations of the testator in respect to those who should become the objects of his bounty, proves many of them to be the same as legatees mentioned in the wills.
In the latter part of March, 1874, Mrs. Hannah Thacher, with whom Mr. Hancock boarded at Orange, N. J., broke up house-keeping with the intention of removing to California, whither, in the following summer, she went to reside with her children who had settled in that State. Mr. Hancock then arranged to live with Mrs. Ryder, a sister of Mrs. Thacher, and while his rooms were being prepared went to visit Maria Hancock and Jane Swenarton, his sisters, at the house of John Swenarton, at Clarkstown, N. Y., as was his usual custom in the spring of the year. He remained at Clarkstown during the summer, and while a member of the Swenarton family he executed the second and third codicils to his will of January 2, 1874.
By these instruments radical and extensive changes and alterations were made in his will.
The first revoked the legacies to Alexander Stewart Walsh and James M. Allen, of $5,000 each and their appointments as executors, and also that to Charles *334 M. Carpenter, of $2,000; ordered $2,000 invested for the benefit of Mary Hancock (his wife, although not named as such), during life, and such fund, upon her death, devoted to such charitable purposes and use as to his executors shall seem best; bequeathed his residuary estate in equal shares to his sisters, Jane Swenarton, Sarah Caíame and Maria Hancock, and to his nephews Augustus Seaman Swenarton,'John Alexander Swenarton, Thomas Hancock Walsh, Benjamin Franklin Walsh and William J. Hardy; and to his nieces Louisa Swenarton, .Mrs. Hortense Seward and Mrs. Adelaide Coker; reduced the bequest to his remaining executor, John Bell Locke, from $5,000 to $3,000, which was given in lieu of commissions; and appointed his friends, Messrs. John W. Hutton and John Swenarton, - both of Clarkstown, N. Y., with his friend John Bell Locke, of Yonkers, N. Y., who hacl been appointed.and retained in the will of January 2, 1874, the executors of his last will and testament, giving a legacy to said Hutton and Swenarton of $3,000 each, to be received by them in lieu of commissions as executors.
In the third codicil to his will, dated July 1, 1874, and executed on that day, he revoked the legacies, in the will, of Hannah Thacher and Josephine Thacher Lindsley, $5,000 each, and also the legacy to the Protestant Orphan Asylum, of Orange, N. J., of $2,000, bequeathed, to them in his said will, and directed that the sums mentioned, and so revoked, should be included in, and distributed as a remainder or part of this residuary estate. Walter H. Shape, Peter S. Van Orden, Elbert, Clement, are the subscribing witnesses to both of the last-mentioned codicils.
The powers of attorney and letter of instruction hereinbefore referred to, were severally executed by the testator to John Swenarton, his brother-in-law, at his house in Clarkstown, on September 10 following; *335 and the powers of attorney acknowledged by him before David Benson, a then notary public for Rockland county. In and by the first in the order of the introduction of these papers on the trial, he authorized his attorney to sell, transfer and assign fifty shares of the capital stock standing in his name on the books of the “Union Ferry Company, of Brooklyn, N. Y.and in and by the second power of attorney to collect, sue for, recover and receive all sums of money which were, or should become due and payable, whether the same were in banks or other forms of indebtedness to him; specifically and specially meaning to authorize his said attorney to collect all rents due to him, all interest due, or to become due him, and to sign Hancock’s name to any check, receipt, order or voucher upon which money may be drawn from any bank where the same then was, or might thereafter be, deposited; particularly intending that his said attorney should, in his, Hancock’s, name and stead make check, or sign receipt for any moneys then on deposit to his credit in the Rockland County National Bank, of Nyack, N. Y., and the Irving Saving Institution, of New York, and the Long Island Savings Bank, of Brooklyn; and upon the receipt of such sums of money aforesaid, acquittances or other sufficient discharges for him and in his name, to make, seal and deliver; and generally all, and every other act, and acts, thing or things, deed or deeds in the law whatsoever, needful and necessary to be done in and abont the premises for him and in his name to do, execute and perform as he might have done if personally present. The paper, called the letter of instructions, was a letter pui-porting to be formally addressed by the testator to John Swenarton, bearing even date with the power of attorney mentioned in it, and by it Swenarton was directed, in pursuance of the" power of attorney referred to, to receive the moneys and property belonging to *336 him, and to pay and dispose of the same, or so much of the same as shall be necessary, as follows: To transfer the Union Ferry stock to his sister Sarah Caíame, and to pay to Thomas H. Walsh, Benjamin Franklin • Walsh, Mrs. Hortense Seward, Mrs. Adelaide Coker, William J. Handy, John A. Swenarton, his before-mentioned nephews and nieces, each the sam of $2,000.
These papers were drawn by Mr. Simpé, and witnessed by him and David Benson, and were called for, produced and put in evidence by the, contestants. The powers and trusts conferred upon, and committed to the attorney by these instruments, were never exercised or executed by him, except so far as on the day of their execution; and in pursuance of the authority therein granted, Mr. Swenarton called upon the bankers of Mr. Hancock in New York city, and demanded the payment of a large sum of money on deposit with them, and standing to the credit of Mr. Hancock on their books. They, however, refused to comply with the demand, and did not pay the money, as there appeared some informality or omission in their execution ; but before the omission could be supplied, and pending Swenarton’s renewed application on September 12, Mr. Hancock died at his house while he was absent on this business. Had Mr. Hancock lived a sufficient time, and his attorney exercised the full measure of his functions and power as such, the ten years’ previous solicitude of Mr. Hancock might have been saved to him as to the distribution of his estate, (to those to whom he willed it) by his executors, for it was practically and actually at his disposal to do with it as to him might seem best with the bulk of the estate. Death came upon the principal, and authority of the agent fell unused.
The case proceeded on the motion of proponent, and two of the subscribing witnesses to the will were sworn and examined—Philip Kingsley and Augustus *337 E. Kissam—but.James W: Field, the third witness, was not sworn in proof of its execution.
Kingsley testified.-that he resided at the time of the execution of the instrument at Orange, New Jersey, and was a student in the law office of Mr. Field, who drew it; that he first saw-the testator about two weeks before that time, and several times intermediate, when he called at the office, but never had any transaction or conversation with him ; that he saw John Hancock sign the will in the presence of Mr. Field and Mr. Kissam, and that Mr. Field asked him if he declared it to be his last will and testament, and if he requested the three witnesses to witness it, and he said yes, according to his best recollection ; and then they signed the will, as witnesses in the order named on the will. On the subject of mental competency of the testator he wus asked, “What wms the intellectual and mental condition of the testator at that time?” And he answered, “Why, he seemed to be in possession of all his faculties ; he w-as an old man, but didn’t seem to be feeble-minded at all.” He further swore that he had only seen testator write when he signed the will, and never transacted any business with him.
Kissam testified that he resided at Huntington, Long Island, and was at Orange on the day of the execution of the wall, visiting Mr. Field, his uncle; that he saw testator sign the wall in the office of Mr. Field, who, with Mr. Kingsley, were present on the occasion ; that he was asked by Mr. Field if that wras his last will and testament, and he answered, it wras ; he was also asked by Mr. Field if he washed him, Philip Kingsley and myself, to sign as witnesses, and he said yes ; and they signed as witnesses. The following question was then asked: “What was the condition of John Hancock on that day as to his soundness of mind and ability to do business ?” And the witness answered, “ He .seemed perfectly sound and *338 able to attend to business.” “Was there any evidence of restraint or influence upon him at the time?” “None that I could see.” The witness further testified that his acquaintance with testator was entirely confined to the occasion on that day when the will was signed, when he saw him from fifteen to twenty minutes, and that he never had any business or conversation with, nor saw him before nor since that occasion.
The act of making a testamentary disposition of property is usually one of great concern, deliberation and care, and the party naturally avails himself of every safeguard which the law has wisely provided to defeat such purpose by any whose interests and avarice might lead to the attempt. The testator usually calls about him reliable friends in whom he has entire confidence, so that his act of making a valid disposition of his estate may be protected, and he have the assurance when the instrument is subjected to the ordeal of the probate court, that they will bear testimony to the fulfillment of the requirements of the law in its execution, and to the competency of the testator, and he and his estate be protected from imposition, circumvention and fraud, and it receive the seals of approval, and operation given to its provisions. Such is the object of a judicious selection of persons, and such the office of a subscribing witness. It is true the law clothes him with the prerogative and privilege of'speaking of the mental condition and testamentary capacity of the testator, and receives his statements as opinions, excepting him from the rule which requires witnesses to testify to the facts in that particular as well as in every other, upon which their opinions may be based, so that the court can determine their value as evidence; still, the opinions of subscribing witnesses are not controlling, but estimated according to the means possessed for their formation. It is to be observed that the subscribing witnesses who were put upon the *339 stand to prove this will, were positively strangers to the testator. It may be that the testimony above detailed meets the requirements of the statute to entitle a will under it to be proved; but it is barely satisfactory to the court or sufficient to predicate upon it the necessary decree of probate. To entitle the will to probate, if it were one devising real estate, it could not be held sufficient, for in addition to the formal proof of due execution, it must also appear to the court that the testator at the time of executing the same was in all respects competent to dispose of his estate, and not under any restraint, by the testimony of at least two of the subscribing witnesses to the will. This will, upon its face and in its phraseology might pass real estate ; but, as on the trial it did not appear that the testator owned or intended to devise, it must be regarded as a will of personal estate, solely, and it may be considered proved. The subscribing witnesses to the first codicil to the will, dated January 30,1874, are James W. Field and Frank W. Baldwin. Baldwin was sworn and examined as a witness, and testified as follows: “ I am the editor of the Orange Chronicle,„ at Orange, N. J. ; my office, on January 30, 1874, was in the same building as Mr. Field’s office ; I was called by Mr. Field intv ‘ ~ office at this time; testator, Mr. Field and myself were mere” ; paper shown witness , “ this paper was placed before me at that time” (the codicil). Q. “ What was then done % A. As near as I can recollect, Mr. Field called upon testator to sign the paper; testator then signed the name, John Hancock, as it is written there ; that was done in Mr. Field’s presence ; Mr. Field asked testator whether he and I should sign the paper as witnesses ; he assented, but I don’t remember his words ; Mr. Field asked testator if he acknowledged the paper to be his last will a-nd testament, or codicil, I don’t know which, and he assented that he did, but I don’t remember his lan *340 guage ; Mr. Field then signed the paper, and I saw him sign it, and then I signed it; testator appeared to me to be a sound man and in possession of his faculties.”
The witness, bping cross-examined, testified as follows : Q. “ When did you first see testator ? A. I had ' never seen testator until that day. . Q. Have you ever had any conversation with him since that occasion? A. No. Q. Did you have any conversation with him on that occasion ? A. No. Q. Then he made no request of you at that time? A. No; not in so many words. Q. Did he ask you to become a subscribing witness to his will? A. No.' Q. Did he make any declaration to you that day in any form? A. No. Q. Did he ask you to become a subscribing witness to any codicil to his will? A- No; only as he did it through Mr. Field. Q. How long did you see testator on that occasion? A. About five minutes. Q. Was ■that all the opportunity you had 'to judge of his ■testamentary capacity ? A. It was.”
The above is the whole of thé testimony given by the witness, James W. Field; the other'subscribing witness was not called by the proponent, nor did lie testify to the execution of the codicil.
The codicil relates entirely to personal estate, and contains two bequests. The requirements of the statute are explicit, plain and mandatory. Two, at least, of the witnesses to the codicil to be proved, shall be pro- ■ duced and examined, each of whom must testify to each and every of the statute requirements prescribed for the due execution of the codicil; and that the testator was' at the time of sound mind, memory and understanding in the language of the law. In the case of a will offered for probate without contest or opposition even, and though there be a liberal presumption in favor of due execution, still the authority to admit it does not rest in the discretion of the court,' however *341 competent to exercise it soundly and judiciously, but is wholly derived from the statute which prescribes the least number of the witnesses, the mode of taking their testimony and its quality and character. The compliance with these requirements need not be a liberal one, but a substantial compliance will be regarded as sufficient. All the acts required must be proved to have been done, for their fulfillment implies that necessary mutual compliance, between the testator and the witnesses, as to the acts of due execution; and when this is made to appear substantially, then follow all the presumptions in favor of such execution, and the carrying out, if possible, of the testamentary intent and purpose of the instrument. Both the subscribing witnesses were in court and thence within its jurisdiction, though residents of another State, and but one was sworn as to its execution.
Pending the cross-examination of James W. Field, on March 11, 1875, a witness called and sworn for the contestants, and when he was asked if the will was executed in his presence and he answered it was, one of the contestants’ counsel admitted the formal execution of the will and first codicil thereto ; and that the signature of James W. Field, to each of those instruments is in the handwriting of Mr. Field, the witness, and weré made by him.
A surrogate court is now denominated a court of record, and is of original jurisdiction; but its jurisdiction is derived from and regulated and restricted by the statutes of the state, and hence has been defined to be a court of special and limited jurisdiction. It has the power to take proof of, and admit to probate wills but the manner of taking the proof, and the extent and quality of it, is prescribed by the law conferring the power. Can, then, the legal and statute directions and requirements, or any of them, be dispensed with? And the proof be furnished ? (of the fullest and most *342 competent character) by and of the subscribing witnesses to a will ? And on this a decree based for the admission of the will to probate ? It does not seem so, for upon well-settled principles, full consent even cannot confer jurisdiction, much less an admission made as the one in question; and it is a clear proposition in itself, and sustained by authority as well, that where a court is commanded to conduct a proceeding in a particular manner, and according to a prescribed formula, no assent, consent, admission or submission of any or of all the parties, can justify a departure from, or authorize the performance of its functions and the exercise of its powers in any other way or manner than as prescribed. This court being, then, without authority or jurisdiction, cannot declare the codicil in question proved, but must direct that a decree be entered setting the same aside as a codicil to the last will and testament of said deceased, and adjudging it to be void.*
The codicils, respectively dated April 14 and Jnly 1, were each executed by the testator, and witnessed at the time of their execution by Walter H. Shupe, Peter S. Van Orden, and Elbert Clement, the subscribing witnesses thereto. Each of them was produced, sworn and examined in the trial, and each testified to the signing of both codicils by the testator at their respective dates, in their presence, at the residence of John Swenarton, in Clarks town ; to the publication of each instrument as a codicil to his last will and testa *343 ment; to the request by him to each witness to become an attesting witness to each codicil; to the signing of each codicil by each witness in the presence of the testator and of each other, and to the soundness of the testator’s mind at the time of his execution of each codicil. Mr. Shupe testified that he first saw the testator at Swenarton’s house in Clarkstown, on or about April 7, 1874, when he called in pursuance of a notice from him for the purpose of transacting some legal business, which proved to be the drawing of a codicil to his will, and that his acquaintance with him began on that occasion ; Mr. Clement, that he first saw the testator at Swenarton’s house, when he attended upon notice from Mr. Shupe for that purpose, and witnessed the signing of the codicil on the day of its date, April 14, 1874; and Mr. Van Orden, that he had known him by sight since I860 ; but that he first personally knew him on the day he called at Swenarton’s residence to witness the execution of the codicil of April 14, 1874, as he was requested by Mr. Swenarton. This testimony proves a very substantial, if not liberal compliance with the requirements of the statute as to the due execution of wills, and is entirely satisfactory to the court; as each witness gave a most intelligent and accurate account of the several parts of the acts necessary to the due execution of the instruments, though their statements, or the statements at least of two of them, as to the soundness of mind of the testator, were founded upon a very limited acquaintance, and unsatisfactory, if not inadequate means, comparatively, of forming the judgment they confidentially expressed. If there existed no other reasons to prevent, these codicils would be entitled to probate, on the proofs of the subscribing witnesses.
At this point in the progress of the case the controversy turned to an investigation touching the character, habits, temperament, disposition, physical dis *344 abilities, mental condition and testamentary capacity of Mr. Hancock, and an inquiry into, or rather, trial of the issue raised as to the imposition,,- .fraud. coercion, and undue influence practiced upon and exerted over the-testator.
From the proofs it appeared that Mr: Hancock, about the year 1850, formed the acquaintance of a Mrs;. Hannah Thacher, a widow with two children a son Henry and a daughter Josephine, who resided in Brooklyn, and their relations were from the cpmr men cement of their acquaintance of the most friendly character, and in the course of time a strong friendship grew up between them, and between him and, her children. In 1856 he took her son Henry, then a lad, into his employment in his store, where he remained until his death in 1867, a period of eleven years, filling with great acceptance the various positions of messenger, ■ clerk, bookkeeper and cashier. In 1852 or 1863 Mr. Hancock became a boarder in Mrs. Thacher’s family in Brooklyn, where she was keeping a boarding-house, and continued to board with her until 1868,' when, she removed to Orange, N. J., and engaged in ■the.same business, where he went with her and remained until he made a trip for health and recreation to Europe, accompanied by his nephew, Rev. Alexander Stewart Walsh,, as a traveling companion, and on ■his re.t-urn in 1870, resumed his home with her and remained until the spring of 1874, except for about a year,, when she gave, up housekeeping preparatory to •her -going to California to join her children and reside •with them there. When Mrs. Thacher gave up. her house at Orange, Mr. Hancock determined to take up •his home with Mrs. .Ryder, a sister of Mrs. Thacker’s, also residing at Orange, and accordingly made arrangements with- her for rooms, which were fitted up, painted and generally prepared as he directed, and into •which lie.ordered, his furniture placed, which, was then *345 at Mrs. Thacher’s. Mr. Hancock, then, according to his custom and pursuant to an invitation, went to the house of John Swenarton, at Nanuet, in Clarkstown, to visit his sisters Jane Swenarton and Maria Hancock for a few weeks, and while his rooms were preparing in Orange. Rev. Horace S. Bishop, Mrs. Ryder, Mrs. Thacher, Rév. A. S. Walsh and John Bonnell, his nurse, each testify to declarations in conversations with them during the spring of 1874, and before he left Mrs. Thacher’s, of his intention to visit his sisters for a few weeks at Nanuet, and then to return and live with Mrs. Ryder at Orange. John Bonnell says, at Orange the testator told me, that he was going to leave Orange for a few weeks, two or three weeks, to go up to see his sisters, and he was going, because Mrs. Thacher was going to break up, and his things would have.to be taken to Mrs. Ryder’s, and that it would take two or three weeks to get every thing ready, and he wanted me to come immediately to Mrs. Ryder’s when lie came back. Rev. Horace S. Bishop says, that when testator went to Swenarton’s in the spring of 1874, he told him that he intended to remain about two weeks and then return and make his home at Mrs. Ryder’s, at West Orange, and should remain there until Alexander (Walsh) should provide a place for him; and that he meant to send his furniture to the house of Mrs. Ryder; the arrangement was, that Mrs. Thacher should go to Mrs. Ryder’s and make it her home. Both of these witnesses, were disinterested and appeared to be entitled to credit, whatever may be said of the others who testified on the same subject, either before or after his going to Swenarton’s ; Mrs. Ryder testified to his engagement of room and board with her, :in March, 1874, and fully to the circumstances attending his going to visit . his -sister, and intention to return.- .Rev. A. S. "Walsh says, I was with him at.Orange at the.house of Mrs. Thacher, *346 when she was packing up, in the spring of 1874, and he said he was going to move and live at Mrs. Ryder’s for the summer, and that, he would go and visit Swenarton’s while his things were being moved to Mrs. Ryder’s house. He said he would stop a few days at my house .in Brooklyn on his way, and asked me to accompany him until he got back to Orange ; that he was getting feeble, and that visit would be his last to Swenarton’s. There are other declarations made by him while at Nanuet, showing that it- was his intention not to remain there, but to return to Orange, as well as of regrets that he had not done so, and also expressions of dissatisfaction with some things done at Swenarton’s, scattered through the testimony of a number of witnesses in the case, who visited or saw him during the period that he was at Nanuet. Mr. Walsh accompanied him to Nanuet on March 27, 1874, but Mr. Hancock took only his personal baggage with him, leaving his furniture and domestic effects at Orange, in care of Mrs. Ryder, and his valuable papers, securities, bank books and other valuables in his safe at Mr.. Walsh’s house in Brooklyn, where was also the will and codicil drawn for him and executed in January preceding at Orange. That his purpose was to make a visit of a few weeks at his sister’s at Nanuet, and his intention to return thereafter to Orange and reside with Mrs. Ryder, there is no doubt; and it was proved, that on a number of occasions during his stay, when he expressed his determination to leave, that he was persuaded by his sisters and John Swenarton to remain. On the occasion of Mr. Walsh leaving him, on the day he went to Nanuet, he made Walsh promise to come and take him back to Mrs. Ryder’s ; and when, some days after, he went to do so, in pursuance of Mr. Hancock’s request, his sisters both said he was too weak to travel, and he was persuaded and remained. Soon after, and about April 1, he *347 made another appointment for Mr. Walsh to come and take him to Orange; but Mr. Walsh did not go, as Mr. Swenarton came to Walsh’s house, in Brooklyn, with an order, written by Maria Hancock, for the trunk containing Mr. Hancock’s securities, valuable papers and will. Walsh refused to deliver the trunk, and said .he would deliver it himself to Mr. Hancock; an altercation followed, and in the course of it Swenarton declared: “ You shall not come to my house and take John Hancock away and Walsh replied : “ You shall not keep him against his will, if he desires to come away;’ ’ and Swenarton, during the interview which took place at the door of Walsh’s house, repeatedly asserted: “ You shall not take him (John Hancock) away.” Walsh took the trunk to Mr. Hancock the next day, related to him what he had done, and he said, “All right.” He again proposed to go back to Orange with Walsh, but Maria Hancock and Jane Swenarton, his sister, advised him to defer going, and he said he would not go ; but after that, and on the same occasion, he wished to make an appointment with Walsh for some other near day-on which he should help him home. His sister, Maria Hancock, urged him to make no other appointment, but to stay awhile, and that John Swenarton would help him back to Orange when he got strong enough to go. On the same day, and after this conversation, Maria Hancock said to Walsh that John Hancock ought to be there, at Nanuet, as it was the best place for him ; that if he died amongst strangers they might grab what he had. Walsh went away and no appointment was made. Hev. A. S. Walsh, whose name has become familiar in this case, was a nephew of Mr. Hancock, being one of the sons of his sister, Mrs. Dorothea Walsh, a lady in moderate circumstances and residing in Michigan during the latter and greater part of the period involved in this contest. Young Walsh, at the *348 age of seven years, lost his father, and his uncle, being attached to his mother and interested in her welfare, soon manifested an interest in and friendship for him, which afterwards ripened into a, strong attachment, and which appeared to continue without interruption or suspicion until the period of Mr. Hancock’s visit to Nanuet in 1874. Mr. Hancock took a fatherly interest in young Walsh, sent him to school, gave him a position in his store in New York, supported him at his own home meantime, chiefly bore the expenses of his collegiate and theological education, and was pleased with his progress and attainments, gratified at his success, made him his social companion, regarded him as his business and confidential adviser and friend ; invited and took him on a tour of pleasure and recreation to Europe; made him the recipient of pecuniary and other favors ; named him as a legatee for a large amount in his will of 1889, and in his will of 1874 both a1 legatee and an executor, and generally spoke approvingly of him, if not affectionately, and often in the hearing of others alluded to him as his son and boy. Walsh was his attendant often in his sickness, and after, his marriage in. 1867 Mr. Hancock was a frequent, visitor at his house and for weeks together an inmate of his house. Between them there appeared to be perfect accord and understanding. That Mr. Hancock, up to the year 1874, in every re.spect reposed confidence in him there can be no doubt under the concurrent testimony during the period alluded to. Mr. Hancock, stricken by disease and consequent disability, was a man of firm purpose and strong will, and would not tolerate any interference with his. business and plans, and resisted its attempt wdth a determination and spirit. He is described to have been polite and considerate in liis social and. business relations and intercourse; upright and honest in his dealings ; and moral and honorable throughout his active life ; and in his feeble and, *349 later days many of his early characteristics would assert their supremacy. Charles M. Carpenter was among his earliest and trusted friends. As early as 1849 he employed him as a clerk in his store, after-wards as a bookkeeper; he made him a partner, and after their separation consulted him as a business friend, regarded him as a social companion, visited his house, made him a legatee under, and an executor of his will of 1869, and a legatee under his will of 1874, and down to the period of the Nanuet visit, in the spring of that year, entertained for him and his family the highest respect if not the kindliest regards. For the last eight or nine years of his life, Mr. Hancock seemed to regard Mr. James M. Allen, of Newark, N. J., as his friend. He was the father-in-law of Mr. Walsh, and in consequence of that relation was brought into more close intercourse with him and his family; was from time to time a visitor at his house, bestowed upon him unmistakable evidence of his regard and confidence in appointing him one of his executors in his will of 1874, and bequeathed him therein a very considerable legacy. It seems remakable, in the light of the testamentary acts of Mr. Hancock in the codicil of April 14, 1874, that after he had, in the will of 1869, bequeathed to the executors therein appointed, of whom Charles M. Carpenter was one, absolutely, and to be equally shared by them, a residue of his estate ; expressed it as his pleasure that they should use the same in their discretion for charitable purposes, “ and in the will of 1874 bequeathed the residue and remainder of his estate” to such benevolent and charitable objects as the executors therein appointed (of whom “Allen” and “Walsh” were two), should in their discretion agree upon, and thus confided one of the most delicate and difficult of trusts, for the execution and fulfillment of which the highest integrity, the most profound judgment, and the purest *350 of motives were invoked ; and from the performancé of which the most devoted of friends; that he should, and without any just sufficient causé, revoke the several legacies, appointments and trusts. These acts, unexplained by any rational motives or cause, would remain the marvel and wonder they proclaim themselves on their face.
John Bell Locke has remained throughout all the changes apparently his trusted friend, and withstood every test to which his fidelity was subjected, whether as companion, executor or friend, and he alone stands as one of the executors of all his wills. From the beginning of his residence in this country he appears to have known Mr. Swenarton, and was his brother-in-law ; as early as 1845 he was an inmate of his family, and in his serious and protracted illness from spinal disease about that time, a recipient of his and his sister’s attention and care. He was, after that, and habitually, a visitor at his house at Harlem, at Plain-field and at Nanuet. There never appeared any serious interruption in their family relations, and he always expressed pleasure in the society of his sisters, Mrs. Swenarton and Maria Hancock ; Mr. Hancock, in his will of 1869, gave him a legacy of $5,000, his wife a legacy of $3,000, and to one of his sons $6,000, and to the other $2,000 ; and in the will and first codicil of 1874, legacies amounting to $20,000 in value and upwards to him and the members of his family ; besides loaning him and them money to large amounts, and without security, except their notes. These seem to be substantial testimonies of regard if not of affection. When in business he took the sons of Mr. Swenarton into his store, gave them positions of emolument and honor, and intended to make them his successors ; and when little jealousies sprung up, as they are apt to, at his attentions and liberality to young Walsh, and complaints were made, they never seriously disturbed his *351 relations with the Swenarton family, nor lessened his attentions and regard for them.
After the illness which prostrated Mr. Hancock, in or about 1845, and confined him to his house and room for about a year, he had a spinal affection or disease, and until about 1866 there is no evidence that he was to any degree disabled; during that year his health became impaired, and he never after entirely regained it; he sought the counsel and care of eminent physicians, and among others Dr. William Parker, of New York; he manifested symptoms of apoplexy and had a slight attack, after which he became feeble, and apprehending that he might die, proceeded to close up his business and “set his house in order.” From that time on to 1872, the evidence shows that the diseases with which he was afflicted were gradually and certainly doing their work upon both his physical and mental or nervous system; diabetes was upon him and paralysis was threatened; he lost flesh, he had difficulty in walking, his memory began to fail, he sought the sympathy and grave attention of his friends, and those about; he went to the seashore and required and employed a nurse, and gave every evidence of decaying powers and waning energies. Dr. Pierson, an eminent physician of New Jersey, who. was sworn as a witness, furnishes the first reliable account of his condition. He attended him in 1872 and 1873, at Orange, N. J., where both then resided, and says that his disease was diabetes, and from its ravages and effects he was incapacitated for any considerable exertion, and became too feeble to walk a mile. He had a stroke of paralysis, which was the second one within three years ; in both these diseases the brain is more or less involved, and Mr. Hancock shared the common fate of all similarly affected, in the loss of memory, in an easily influenced disposition, in a weakened will and in the growth of unaccountable mental idiosyn *352 crasies ; as time progresses, these symptoms increased and became more acute, and ultimately and necessarily, as the body fails and gives way ; the mind suffers correspondingly, and loss of memory increases, nervous irritability, loss of nervous control, and ultimately indifference to everything but the gratification of appetite,follow.
The real and serious difficulty affecting the mind and testamentary competency of Mr. Hancock followed the paralytic stroke which he had in February, 1874, as an effect during the remainder of his life, and from which his system never fully rallied. When he went to reside at John Swenarton’s at Nanuet, the testimony shows him to have been in a condition which rendered him peculiar^ susceptible to the influence and control of those about him. He was not a person at that time of unsound mind, according to the opinion of experienced and competent physicians, but his mind and memory were much impaired, his will force lessened, his temper irritable, and his nervous power far below normal condition and healthy life. It was plain to the observation of all who knew and were about this time brought in contact with Mr. Hancock, that the powers, not only of his body but of his mind, were failing; for even Mr. Swenarton himself declared John Hancock is losing his mind, he forgets everything that he does, and I have to watch him when I am with him to keep him from paying bills twice. It was in this condition the testimony proves him to have been when Walsh took him to Swenarton’s and left him there, on March 27,1874, and between' that day and the sixth day of April following, the box or trunk containing his will, securities and valuable papers with his safe were taken -there from Walsh’s house and placed in the keeping and under the control of John Swenarton. There can be no doubt about it, for he swears himself that the box was put by-; himself in the safe, that it was not *353 locked all the time, and that he had a key to the safe. When the will arrived at his house and he had inspected it and first definitely learned its provisions, he first conceived the necessity for its alteration ; he stated to the maker of it his objections, and told him it was not the will he would make ; he approved its provisions down to the ninth item, which, according to his own testimony, was his first objectionable bequest, and he affixed the seal of his condemnation in the form of a mark or cross in pencil, which it still bears, which was a legacy to Hannah Thacher of $5,000, and this was repeated as to the legacies of Josephine T. Lindsley; to the Protestant Orphan Asylum of New Jersey ; to W. Walsh ; to Charles M. Carpenter ; to John Bell Locke ; to James M. Allen ; and to the direction of the residue of the estate. It is proved, and Mr. Swenarton does not deny it, that he stated to Mr. Hancock that Walsh had mutilated his account book ; forged his name to a letter; taken unlawful interest for the loan of his money to Douglass, his mortgagor ; falsified his accounts ; called his attention to the proved villany of Carpenter ; to the necessary complicity of W. W. Allen with Walsh to injure him; the large and unequal share Mrs. Thacher had had of his estate ; the prodigality of Walsh in the use of money ; his dishonesty ; the condition of his account books as kept and perverted by Walsh ; the unlawful abstraction of checks drawn to order of Walsh, the tearing out of the stubs in his check book; Walsh’s desertion of him when on the European trip ; the non-payment of interest by Mrs. Thacher on the mortgage he had assigned to her ; and with a general charge against these parties and others that they meant to wrong him and get his money. Mr. Swenarton says that he resolved to alter his will, talked of Mr. Field, and, on suggestion, concluded to send for Mr. Shupe, who promptly came on notice from Mr. Swe *354 narton. The will, of 1874 was placed in his hands, and he was directed to prepare a codicil, which would revoke the provisions indicated by the pencil marks placed thereon by Mr. Swenarton, who was present most of the time during the visit of Mr. Shupe, as was Maria Hancock, taking part in the conversation with the lawyer. As Mr. Allen and Mr. Walsh were to be removed, as executors it was necessary that others should be selected in their places, and Mr. Shupe was directed to insert the names of Mr. Hutton and Mr. Swenarton. as such. Mr. Swenarton suggested the name of Mr. Hutton, but who suggested his name does, not appear. Mr. Shupe prepared a draft of the codicil and read it to Mr. Hancock and he approved it. A week after, Mr. Shupe brought the codicil engrossed, andit was executed. Subsequently Mr. Shupe was directed to prepare a second codicil, which he did by the instruction of testator, and it was executed on July 1,1874, and it was in substance a revocation of the legacies to Hannah Thacher, her daughter, Mrs.Lindsley, and the Protestant Orphan Asylum at Orange. It seems noticeable that all the suggestions made tiy him to Mr. Hancock as to changes in his will were really carried out in the codicils drawn by Mr.. Shupe, and that the legatees and executors who had fallen under the ban of Swenarton1 s disapproval were cut off and their appointments and legacies revoked, and the bounty of the generous testator granted to others. When Mr. Swenarton made the changes and. complaints to Mr. Hancock against the persons referred to as legatees in his will, and whose appointments as executors and legacies were revoked,' he does not swear that they were true ; they were communicated, discussed and commented upon as impressions or information he had conceived or received from others, while Mrs. Thacher, on oath, declares that the payment of interest accruing on the mortgage which *355 Mr. Hancock had assigned to her as a gift during her life, was not subject to any such condition. Mr. Walsh says that he did not mutilate or falsify his account books, abstract checks which had been given and drawn to his order, nor cut out the stubs from the check books, nor take or cut out leaves from his ledger or other account books ; that he did not forge Hancock’s name to a letter, but that he wrote it himself ; that he did not leave his uncle in England to take care of himself, but that he returned home to see his sick wife, in pursuance of a telegram that she was dangerously ill, and with his uncle’s consent and approval; that he did not demand or receive a bonus from Mr. Ross ; that the moneys he collected from Mr. Douglass were authorized by Mr. Hancock himself; that both Mr. Field and Mr. Geary swore that Mr. Hancock had demanded and received bonuses for the loan of money in Orange. Mrs. Thacher also testifies that she never kept nor disposed of any furniture of Mr. Hancock, and that the only furniture of his in her house was that used by himself and removed to Mrs' Ryder’s by his directions. After the codicils had been executed, Mr. Walsh, Mr. Carpenter and Mrs. Thacher visited Mr. Hancock at Nanuet, but no information was given them of the revocation of the will as to them. Mrs. Thacher reveals that she received letters from Mr. Hancock in May, June and July, 1874, in which he expressed regrets at the breaking up of her family, as he knew that in his failing health he needed, the kind care he had always received in her family, and which he did not expect elsewhere, especially at Mr. Swenarton’s. That his letters were always filled with (jsuch expressions and gratitude for attentions to him; that Mr. Hancock had invited her again to visit him, but she did not go, in consequence of the receipt of a letter from Maria Hancock, stating that her brother is sick, John Swenarton is sick, *356 Louisa is sick, and it will not be convenient or pleasant for you to make a visit. Mrs. Ryder testified that on August 17, 1874, when Mr. Hancock had been brought to Orange, by Mr. Swenarton, a few days before Mrs. Thacher left for California, she heard Mr. Hancock tell Mrs. Thacher that they want me to cut you off from my will. She said, you would not, would you ?' And he answered, no. This was six weeks after the codicil revoking the bequest to Mrs. Thacher ; and he did not know of the revocation. Mr. Walsh testified, that about September 1, 1874, he and the Rev. Mr. Ebaugh visited Mr. Hancock, that he was in bed and very sick, and Mr. Ebaugh asked him if he felt prepared to die. He said he. did, that he had tried to be honest in life and to do good. I have provided for you two. Mr. Ebaugh asked him if he had his business all arranged to suit him, he said, yes ; then a short time after he said, “ my affairs are all mixed up,” Mr. Swenarton has mixed, my books up and my will. I don’t know how anything is. Mr. Swenarton doesn’t know anything about books. I wish I could see Mr. Field. He complained that his body was sore, he said Mr. Swenarton had got him in and out of bed so many times that his body was all bruised; repeating two or three times getting me in and out. to sign things ; when they were getting ready to go Mr. Ebaugh proposed devotional exercises ; he said, yes ; and he requested me to read a chapter in the Bible, and Mr. Ebaugh offered prayer.
Mr. Swenarton, in testifying to the condition of Mr. Hancock, during the last month of his life,-and when in the last stages of disease, said that he had two large boils on his abdomen ; sores between his thighs apd the scrotum; the scrotum greatly swollen ; two sores on the back of his leg, and one of them two inches in diameter, and the other about one inch, and that he complained of pain at the least touch; and it was while *357 Mr. Hancock was in such condition, and in a dying state, forty-eight hours or less before his death, that he signed the powers of attorney to John Hancock, and gave away, by assignment, $3,000 to Maria Hancock; 300 shares of Clark Thread stock to Jane Swenarton and Lohisa Swenarton, worth from $15,000 to $20,000; and it was immediately after these assignments that he executed the powers of attorney, and on which Mr. Swenarton demanded the payment of the $14,000 in Stewart’s hands on the very afternoon of Ms death, to wit: September 12, as Mr. Swenarton swears. Mr. Hancock had, a year before these scenes were enacted, expressed a wish to guard against and prevent such occurrences. Mr. Carpenter testified that in a conversation he had with him in 1873, in New York, Mr. Hancock said remarks had been made by some of his relatives that there would be a jolly time over his property when he was dead, and he wanted to have no such complications, that he feared paralysis, and wanted that will business over with, for he feared if he was paralyzed or weakened that he might be induced to do things in regard to his property which he didn’t want to do, and it had been his study for years to avoid it.
Dr. Smith, of Spring Valley, an old and apparently experienced physician, and the last who attended Mr. Hancock, thought him, when he last visited him professionally, about September 1, on the verge on paralysis, but he declined to give any opinion as to his mental condition, though he was rational. He supposed Mr. Hancock died of partial paralysis.
Dr. Challes Corey expressed the opinion, on the diagnosis of Dr. Pierson, and the- other testimony in the case touching his physical and mental condition up to April, 1874, that at that time he was of unsound mind, and that he was incompetent to make a will, as he was in the condition of senile dementia,, from which *358 there is no hope of recovery: the indicia of which are, weakness of memory, impaired judgment, dull perception ; childishness of disposition; indecision of character—perhaps obstinacy ; perhaps prejudices against ' friends ; easily influenced ; and as the person grows older all these symptoms become more apparent. Dr. Corey was for ten: years in the Bloomingdale Asylum engaged in the care and treatment of the insane, and • afterwards physician to the Kings County Lunatic Asylum, and now its consulting physician; and his' position, acquirements and experience are such on the diseases of the mind as to entitle his opinions to great consideration. Dr. Alexander N. Doughtery, after reading the symptons manifested in Mr. Hancock ás detailed by Dr. Pierson, whom he spoke of as a gentleman of high professional standing, and other witnesses, was of the opinion that after February, 1874, he was incapable of making a valid will, by reason of mental incompetency. Apoplexy is a disease of the brain and often followed by paralysis. All the disabilities under which Mr. Hancock was physically, indicated that he had paralysis, and of the kind known as hemiplegia. Dr. Brown, in his work on the jurisprudence of insanity, in speaking of the symptoms of dementia, says delusions and suspicion often arise, and these may be of definite type or multiform ; this moment the patient fancies he has been swindled, the next, that that he has been poisoned, and the next again, that he has been abused, perhaps, by his best friend. Invariably, and this is the important point in diagnosis, they are associated with obvious failure in perception, memory, apprehension, judgment, and depend really upon errors of sense and reasoning.
If this court were to answer the question propounded by the proponents’ counsel on the argument, whether the testator was, within the meaning of the law, at the timé of the execution1 of the codicils of April and duly, *359 1874, a person of sound mind, and possessing testamentary capacity to make their execution an operative valid act, in the light of the medical testimony and opinions touching the testator’s condition and competency, it would certainly say, no, he was not of sound mind, nor f did he possess testamentary capacity, and it would'set these codicils aside ; but in reviewing the testimony of those who were, at or about the time, about him, who saw him, conversed with him, transacted business and consulted with him, it is impressed with the conviction that amid all the mental and physical disabilities which afflicted him, he still retained sufficient vigor of mind, power of judgment, strength of memory, and mental comprehension of the acts in which he was engaged, and of the persons he was bestowing his bounty upon, to perform a valid act in the dispositions he made of his property by those codicils.
It has been decided, and the true test of testamentary capacity is, the competency of the testator to understand and comprehend the act in its relation to his .property and to the objects of his bounty; in other words, competency to execute a valid will does not exist unless the testator has reason and understanding sufficient to comprehend such an act.
Mr. Shupe detailed with great force and perspicuity all that took place between him and the testator when he received instructions to draw the codicils in question, as well as his acts and language on their execution, and that, together with the testimony of the other attesting witnesses, which the court must credit, brings the factum, within the legal rule.
But the other and remaining question, whether these codicils were procured from him by undue influence exerted upon him by others—whether of fraud, imposition or coercion—is more difficult to determine and answer. Taking the theory of the proponents, as evidenced on the trial, Mr. Hancock, at the time of the *360 preparation and execution of the codicils, was somewhat vigorous, both in body and mind; that his memory was not materially impaired; that his will was strong, his purpose firm ; and that he was master of himself and of the situation, and made the changes in his will by the revocation and provisions of the codicils, by his own suggestion and volition, uninfluenced by. any motive, cause or reason, save his own will and purpose, in the premises. This position would have been as impregnable as tenable, if the proofs had been .furnished to sustain it. • When Mr. Hancock went, or rather was taken, to the residence of Swenarton, in .Clarkstown, in the month of March, 1874, he was a broken and feeble old man, with greatly impaired powers of mind and body, with the diseases of diabetes and paralysis upon him, and his will or nervous energy enervated; his keener comprehension blunted ; and liable to the influence of those about him. His purpose was to visit his sisters for a few weeks, and after that his intention to return to his home in Orange, which he provided before leaving, and so strong was this desire in him that before Mr. Walsh left him he requested that he would return in a few days and take him back to Orange. But it was the purpose of John Swenarton, his wife, and Maria Hancock that he should not return, but remain with them. Their declarations to him and others were so strong and determined on the subject that they amounted to duress, and the evidence fully supports the conclusion that John Hancock was coerced against his will to re'main an inmate of Swenarton’s household. This was the first and necessary step to the accomplishment of a purpose in respect of his property in the codicils. The motive of gain to the mind of . John Swenarton for himself, his wife, his sons and his daughter was too strong to be resisted, and after acquainting himself with the provisions of his will, there was every reason why he *361 should cause or adopt means for the revocation of the portions which subsequently were revoked, he adopted the means, which were by the insinuations, innuendoes, groundless statements and false inferences of, concerning and against those who had been considered by Mr. Hancock but a few months before the proper objects of his bounty. In his helpless and weakened state he fell an easy victim to the hates and prejudices of the Swenartons, and to the financial diplomacy of his sister Maria in behalf of the substituted legatees. He was made to believe that his will was not fully or legally executed; that his former friends had deserted him ; that the executors whom he had selected with great circumspection and in whom he confided were scoundrelly, and not entitled to his confidence, that he had been robbed ; that his name had been forged by his favorite nephew; that some persons in New Jersey had secured by some unlawful manner large sums of his money; that their legacies in consequence should be cut off; that under this pressure and imposition exercised for a short week, he was ready to sit down and have John Swenarton mark the items of his last will and testament to be revoked or changed, and the next day to send for a lawyer and give him the necessary instructions. It was done, and the codicil of April 14 was made and executed, and the same process was repeated soon after, and the codicil of Julyl, 1874, was made and executed. Proof of the papers made on September 10, and of their contents, and of the acts done in pursuance of their authority, is only useful to show as a sequel to whole proceedings to show what extremities the love of money will carry a man.
A strong pecuniary motive, says Judge Davies, in the Parish case,* is frequently found too strong for most *362 other human motives to contend with; and the difficulty of resisting great temptation of this sort is universally acknowledged where the way to wealth lies through the comparatively easy road of acting on the feeble mind and the feeble body by attentions on the one hand and by (threats) importunities on the other; it is cause rather for regret than surprise when we find that the means have been used and the result attained. This language was employed to express the estimate of the court of the acts of a wife to circumvent • the will of a husband in the procurement of two codicils, and in which she succeeded, but they were set aside by reason of the undue influence which she exercised against him.
Extreme avarice almost invariably overreaches itself, for there is no passion which more often defeats its purpose and deprives itself of its object, nor on which the present exercises so much power to the prejudice of the future. Avarice has been said to be the grand sepulchre of all other passions, as they successively decay; but unlike other tombs it is enlarged by repletion and strengthened by age. The changes effected in the will of John Hancock by the codicils under consideration are in contravention of his oft-declared intentions and purposes as to the disposition of his estate, and the beneficiaries under it, made long prior to the execution of any will, and carried out when he made and executed both the wills whose contents are known. Every testator has, of course, , the right to change radically, and even arbitrarily, ' the manner of disposing of his property; and, in the absence of fraud or imposition, courts will sustain his action in this.respect. But when it has been found that an unnatural change has been made in a sick man’s will, and one apparently contrary to his previous fixed, and determined purpose, it is the duty of the courts to scrutinize closely the circumstances, with a view of *363 ascertaining whether the act was free, voluntary and intelligent, or whether it was a substitution of the volition and interest of another, who by some irresistible influence secured the change. It is not indispensable that the precise mode of practicing the imposition, exerting the coercion, or committing the fraud should be proved ; if the circumstances attending the act raised a legitimate presumption of fraud it is proper so to find in the absence of sufficient explanation ; for it is rarely the cáse that direct evidence can be furnished, that undue influence has been exercised over the mind of a testator in the execution of a testamentary instrument. The act is what is seen and tangible, while the moving and approximative motive and cause may be subtle and altogether hidden. This was true in the Parish case, before mentioned, for there a highly honorable lawyer was made, through his professional ability, the medium of carrying out the influence which Mrs. Parish had secretly exerted over her sick and disabled husband.
Upon all the facts and law of the case, this court is impressed with the conviction that the codicils to the will of John Hancock, respectively dated April 14, and July 1, 1874, were obtained by imposition, fraud and undue influence, and that they are not entitled to be admitted to private as such, but are severally void, and a decree is ordered to be entered accordingly.
On an appeal from this decision the general term of the supreme court in the second department, held that any defect in the proof of the first codicil had been waived, and it should have been admitted, but that the other codicils were properly rejected on the ground of fraud and undue influence. For the opinion of the general term, see 22 Hun, 38.
From so much of this decision as rejected the second *364 and third codicils an appeal was taken to the court of appeals.
Danforth, J.
[After stating facts.]—An appeal from his decision as to the three codicils was taken to the general term of the supreme court, where it was reversed as to the first codicil, and affirmed as to the second and third. An appeal is now taken to this court, by said John Swenarton and John W. Hutton, from so much of the judgment- of the supreme court as affirms the decision of the surrogate, and the only question before us relates to the second and third codicils. No question of law is presented,—one of fact only,—and we find no reason to differ from the concurring judgments of the courts below. It would not be profitable to give here an analysis of the evidence or rehéarse in detail the steps which lead to this result. It has been well and satisfactorily done by the learned surrogate and the general term in assigning reasons for their decisions. There was on the part of the testator not only age, infirmity and disease, but such advantage was taken of his condition that the execution of the two codicils may well be ascribed to necessity and compulsion rather than a voluntary disposition. In such a case the instruments cannot stand, and it was right that they should be rejected.
We think, therefore, that the judgment appealed from should be affirmed, with one bill of costs to the executors first named, to be paid by the appellants, but without costs or disbursements to any other party.
All the judges concur, excep Rapallo, J., absent.

 On appeal the general term of the supreme court decided that this codicil was sufficiently established, holding that any defect in the proof of its due execution was waived by the admissions of the parties. And that such admissions, there being no infants in the case, might be taken in lieu of the examination of the other subscribing witness, as the statutory requirement that both of the witnesses must be examined, is subject to the qualification that they are residents of the State (See 22 Hun, 38).

 Delafield v. Parish, 25 N. Y. 9.