Argued May 5, affirmed May 25, 1915.

# IN RE DIGGINS' ESTATE.
## DIGGINS v. DIGGINS.

(149 Pac. 73.)

**Wills—Validity—"Testamentary Capacity."**

1. Where a testator at the time he executes his will understands the business in which he is engaged, has knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses "testamentary capacity," notwithstanding old age, sickness, disability or extreme distress.

**Wills—Validity—Incapacity—"Delusion."**

2. A "delusion" indicating testamentary incapacity must spring up spontaneously in the mind of the testator, and not be the result of extrinsic evidence of any kind.

> [As to insane delusions as affecting testamentary capacity, see note in 63 Am. St. Rep. 94. As to testamentary capacity and contractual contrasted, see note in Ann. Cas. 1915A, 362.]

**Wills—Validity—"Undue Influence."**

3. "Undue influence" sufficient to set aside a will must be such as to overcome the free volition or conscious judgment of the testator and to substitute the purposes of another instead, and must be the efficient cause of the disposition of the property.

**Wills—Validity—Undue Influence—Confidential Relations.**

4. Where a confidential relationship existed between testator and the beneficiary, and the will is inconsistent with the claims of duty and affection, slight evidence that the beneficiary has abused the confidence will suffice to invalidate the will.

**Wills—Contest—Evidence—Incapacity—Undue Influence.**

5. In proceedings to contest a will, evidence *held* to show that the testator had sufficient testamentary capacity; that he was under no delusion as to the amounts he had given contestant and was not unduly influenced.

> [As to undue influence as invalidating wills, see notes in 16 Am. Dec. 257; 21 Am. St. Rep. 94; 31 Am. St. Rep. 670.]

From Wallowa: JOHN W. KNOWLES, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

David Diggins died on September 2, 1912, leaving a will which was contested by his son, Thomas L. Dig-

*The authorities passing upon what constitutes testamentary capacity are presented in the notes in 27 L. R. A. (N. S.) 2 and L. R. A. 1915A, 443.                REPORTER.

gins. By the terms of the will, which was executed March 13, 1912, the testator directs the payment of his debts; provides for a tombstone for himself and one for his wife, Malvina A. Diggins, provided she does not again marry; directs the construction of a suitable iron fence around his lot in Prairie Creek Cemetery; bequeaths to Prairie Creek Cemetery Association $250, provided that the association shall first have constructed a substantial and suitable addition to the church building located on the cemetery grounds; bequeaths to Thelma Diggins and David Diggins, Jr., children of Thomas L. Diggins, each the sum of $100, which shall be placed at interest and paid over when the legatees become 21 years of age, but if one dies both sums shall be paid to the other, or if both die before the age of 21 years then the entire bequest shall become the property of their father, Thomas L. Diggins; bequeaths $100 to Thomas L. Diggins; gives to his wife, Malvina A. Diggins, a lot in the town of Joseph, Wallowa County, Oregon, and all of the household goods, furniture and effects; bequeaths to his wife, Malvina A. Diggins, in lieu of dower, such sum as may be necessary for her maintenance and support so long as she shall remain his widow, not exceeding the sum of $500 each year; and gives the remainder of his estate to a stepson, Leroy G. Isley, to be held in trust by the executor, who shall pay to said stepson out of such remainder for his schooling, maintenance and support, during his minority, such sum as may be necessary until attaining the age of 21 years, and thereafter the executor shall pay over to Leroy G. Isley the net income until he shall have attained the age of 25 years, at which time, if the stepson is found to be an industrious, ambitious

and economical man and a good citizen, all such remainder shall be turned over to him, but if he is not at that time a man and citizen of the character mentioned, he shall receive only the net income until such time as he proves himself worthy. The will further provides that if the stepson, Leroy G. Isley, shall die, leaving no widow or legal issue, then the remainder shall go to the son, Thomas L. Diggins, and a niece, Mahala Diggins, share and share alike. S. P. Williams is appointed executor, and should any beneficiary contest or aid in contesting the will, then such beneficiary shall receive nothing. Unsoundness of mind and undue influence are assigned as the reasons for the contest. The petition assailing the will alleges in general terms that, as the result of old age and serious mental and physical diseases, the mind of deceased was unsound and his memory was destroyed; and it is then averred with some particularity that the deceased was entirely under the influence of Malvina A. Diggins and her son, Leroy G. Isley, and other persons acting with them. The will was admitted to probate by the County Court and sustained by the Circuit Court, whereupon the contestant again appealed.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Cochran & Eberhard* and *Mr. Samuel D. Peterson,* with an oral argument by *Mr. George T. Cochran.*

For respondents there was a brief over the names of *Mr. A. M. Runnells* and *Messrs. Sheahan & Cooley,* with oral arguments by *Mr. Runnells* and *Mr. Daniel W. Sheahan.*

Mr. Justice Harris delivered the opinion of the court.

The surroundings of the litigants may be better apprehended after a brief statement of the relationship of the parties. Thomas L. Diggins is a son of deceased and of a former wife, from whom David Diggins became estranged. After the separation, and on May 30, 1894, David Diggins married Malvina A. Isley, who had several children of her own, one of whom is Leroy G. Isley, who at the time of the marriage was about 3 years of age. Leroy G. Isley lived with his mother and stepfather most of the time until the spring of 1909. David Diggins and his wife, Malvina A. Diggins, quarreled, separated and settled their property rights in 1904, but about two years thereafter they became reconciled, after some solicitation on the part of David Diggins, and resumed the relations of husband and wife. Malvina A. Diggins at the time of the execution of the will was not friendly to Thomas L. Diggins, and had not liked the latter after the trouble with her husband. The testimony clearly shows that the deceased during his lifetime entertained a genuine affection for his son, Thomas L. Diggins, and also for his stepson, Leroy G. Isley. David Diggins moved to Wallowa County with his family in July, 1894, and lived there until the time of his death. Thomas L. Diggins, who resided in Umatilla County, visited his father only four or five times after the latter moved to Wallowa County, but the father made a number of visits to his son at his home.

The execution of the will did not occur until after some deliberation. David Diggins engaged the services of an attorney, stating at the time that he desired to make a will, and telling how he wished to dispose of his property. A previous will was destroyed.

Three or four rough drafts were prepared, studied, considered and destroyed. At the end of two or three weeks, being satisfied with the language of the disputed writing which directed the disposition of the estate in conformity with his wishes as first expressed to his attorney, the testator formally executed his will. David Diggins knew the contents of each of the rough drafts as well as the provisions of the will itself. The only conclusion warranted by the evidence is that no person except the attorney and testator ever read any of the rough drafts of the will, or heard the same read.

1. Unsoundness of mind and undue influence constitute the grounds upon which the contestant rests his claim that the testator lacked the necessary capacity for making a valid will. The measure of capacity required has been stated many times by this court:

"If a testator at the time he executes his will understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body or extreme distress": *Ames' Will,* 40 Or. 495, 504 (67 Pac. 737, 741); *Hubbard* v. *Hubbard,* 7 Or. 42; *Clark's Heirs* v. *Ellis,* 9 Or. 128; *Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6); *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846); *Stevens* v. *Myers,* 62 Or. 372 (121 Pac. 434, 126 Pac. 29); *Wade* v. *Northup,* 70 Or. 569 (140 Pac. 451).

2. Definitions of a delusion, stated in different terms, but expressing the same meaning, appear in *Potter* v. *Jones,* 20 Or. 239, 248 (25 Pac. 769, 772, 12 L. R. A. 161), where this court quoting from *Middleditch* v. *Williams,* 45 N. J. Eq. 726 (17 Atl. 826, 4 L. R. A. 738), says:

"It is only a delusion or conception which springs up spontaneously in the mind of a testator, and is not the result of extrinsic evidence of any kind that can be regarded as furnishing evidence, that his mind is diseased or unsound; in other words, that he is subject to insane delusions. If, without evidence of any kind, he imagines or conceives something to exist which does not in fact exist, and which no rational person would, in the absence of evidence, believe to exist, then it is manifest that the only way in which his irrational belief can be accounted for is that it is the product of mental disorder. Delusions of this kind can be accounted for upon no reasonable theory except that they are the creations of the mind in which they originate."

In *Wade* v. *Northup,* 70 Or. 569 (140 Pac. 451), approval is given to the announcement appearing in *Fulton* v. *Freeland,* 219 Mo. 494, 517 (118 S. W. 12, 18, 131 Am. St. Rep. 576), in which it is said that:

"There is no such thing as a delusion founded upon facts. It is a mental conception in the absence of facts. If the idea entertained has for a basis anything substantial it is not a delusion. There may be a misjudgment of facts, or there may be an accentuated opinion founded upon insufficient facts, but not a delusion, rising to the dignity of a mental aberration."

See, also, the comprehensive notes to *Slaughter* v. *Heath,* 127 Ga. 747 (57 S. E. 69), as reported in 27 L. R. A. (N. S.) 1.

3. Undue influence sufficient to set aside a will—

"must be such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purposes of another instead, and must be the efficient cause, without which the obnoxious disposition would not have been made. * * It is not all influence brought to bear upon the mind of the testator in the disposition of his property that may be denom-

inated undue or fraudulent, as a friend or relative, or even those in confidential relation, may employ argument, or even persuasion, to induce a bequest, so that, notwithstanding it leaves the mind free to act upon its own considerations and judgment'': *Holman's Will*, 42 Or. 345, 358 (70 Pac. 908); *Pickett's Will*, 49 Or. 127, 153 (89 Pac. 377); *Turner's Will*, 51 Or. 1, 8 (93 Pac. 461).

4. If a close confidential relationship existed between the testator and the beneficiary, and the will as made is not consistent with the claims of duty and affection, then slight evidence that the legatee or devisee has abused the confidence imposed in him will suffice to invalidate the will: *Holman's Will*, 42 Or. 345, 359 (70 Pac. 908); *Turner's Will*, 51 Or. 1, 8 (93 Pac. 461).

5. No useful purpose can be served by recounting all the voluminous testimony, but it will be quite sufficient to refer to only so much of the evidence as is necessary to understand the condition of the testator's mind and his surroundings. David Diggins was aged about 79 years when making the will, and he left an estate valued at about $21,000. He had been afflicted with palsy for some time; he had been troubled with a sore on one of his limbs, was childish, but had no hobbies, and his memory gradually failed, especially during the last two years of his life, although, like many aged people, he possessed an accurate recollection of the events of his early life. Although physically weakened by the infirmities of old age, he planted and cultivated a garden in 1911 and 1912. He was accounted a good trader, was not inclined to discuss his business affairs with other persons, transacted business before and after the date of signing the will, was set in his ways, firm in his ideas, and, as one witness expressed it, he was ''a good stayer.'' He was

a constant reader of the newspapers, and discussed with intelligence all that he read. Before proceeding with the discussion, it is proper briefly to note the testimony of the witnesses concerning the mental condition of the testator.

F. F. McCully, who was one of the attesting witnesses, testified that he did not consider the testator competent to transact business without aid, because his memory was not good, although, as cashier of a bank, he would have honored any checks signed by David Diggins.

Dr. J. H. Thompson, who was the family physician and had known the deceased 11 or 12 years, deposed that he attended the testator during his last sickness, that the patient possessed a clear mind and was rational August 19, 1912, and that he was competent to transact business until about 10 days before his death, during which period the mind was affected by uremic poisoning.

J. M. Thompson said that he was intimately acquainted with the testator the last two years; that during that period he was a fine entertainer on whatever subject was discussed.

Mrs. Nathan Tryon believed that his mind during the last two years was just the same as it always had been, and she could not see anything wrong with his mind at all.

J. B. Streeter testified that his mind seemed always to be all right, and that he was not different from most people, except that he was afflicted with palsy.

Charles Scott testified that he had been acquainted with David Diggins since 1898, and saw the latter in August, 1912, and observed nothing unusual in his appearance.

Wesley Duncan knew Diggins since 1879, and met him quite frequently during the two years before his death; that—

"he was like most old men; as he got old and feeble he was more feeble. Ordinarily his mind was good. He got more forgetful as he got older and a little more easily excited."

J. A. Rumble, upon returning from California on March 24, 1912, noticed that Diggins had failed physically and to some extent mentally.

E. T. Roup, a farmer and vice-president of the First Bank of Joseph, when speaking of his physical condition during the last year of his life, said that he had failed right along like any man would naturally, both mentally and physically, and was inclined to tell the same thing over once in awhile, like any old person would do.

Frank Stevenson said that his health failed during the last two years of his life, but could not say so much about his mental condition.

N. C. Longfellow testified that during the last two years of his life his health failed decidedly, and that his memory was failing him fast.

Charles McLane stated that during the last two years of his life "he was like any old man; he was feeble in health," and childish, but could not say that his ability to transact business was affected.

S. H. Warfield, a brother-in-law, saw him in April, 1912, at which time he seemed to be more childish and nervous than before, but did not observe much difference in his memory.

The attorney who drew the will and Malvina A. Diggins stated that the testator was competent to dispose of his property and to transact business, while Thomas L. Diggins testified to the contrary. There

is evidence, however, to the effect that before the will was opened, and at a time when the contestant believed that he was made the principal beneficiary, he stated that "they would break $60,000 before they would break the will."

The contestant urges with much emphasis the claim that his father entertained an unfounded belief, amounting to a delusion, that he had, before making his will, given to the son $15,000 or $20,000; that such delusion affected the terms of the will; and, further, that the provisions of the will, when applied to Leroy G. Isley, were glaringly inconsistent with the conditions surrounding the stepson, but were entirely congruous and harmonious when applied to the deceased's nephew, Charles Diggins, who had since died.. So far as pertinent to the inquiry the evidence will be briefly noted. The contestant testified that his father told him in March or April of 1912, which was probably after the will had been executed, that:

" 'What I have,' he says, 'you will get. What I have will never go out of the Diggins' name.' "

The testator told the attorney who prepared the will that:

"In the past he had helped his son, probably giving him altogether something like $15,000 or $20,000, and that his son was worth probably three or four times as much as he was, and that he did not want to leave him over $100."

During the period of about two years when David Diggins and his wife were separated, the former made his home with Thomas L. Diggins; and at some time during that period, probably in 1905, but before the reconciliation between David Diggins and his wife, when every circumstance pointed to the complete

absence of any possible undue influence, the testator, in a conversation with Charles Scott—

"talked about Tom, and he said he had given him all he intended to; that he had helped him lots when he was getting started, and he wouldn't give him any more. What he had he would give to someone else."

The contestant testified that in about 1893 he purchased from the father 160 acres of land known as the Hurst place, giving therefor a span of colts valued at $330 and a set of harness priced at about $45, and that the land had been previously valued at $800, and a short time afterward the son purchased from his father more land valued at approximately $4,600, about 560 acres being the total amount of land conveyed by the testator to the contestant. The father had given the son $30 in money, a horse, and a cow and in 1905 loaned him $1,000 which was repaid. At the time of the trial Thomas L. Diggins owned 1,800 or 2,000 acres of land, and the value of his worldly possessions, when compared with the estate of his father, was about as stated by the testator.

The record shows conclusively and without any contradiction that David Diggins was attached to his son and took much pride in the fact that the contestant had acquired considerable property, and while it was not literally true that the son had been given $15,000 or $20,000, still the father no doubt considered that the transactions already narrated were helpful to the son to the extent that without them he would not have prospered, but by reason of them he was enabled to achieve the success afterward attained. The contestant purchased the Hurst place for one half the price previously placed upon it. The testator may have overestimated the assistance he gave to the son, and to that extent misstated the facts, but it is more than a plausible explanation to say that it is fair to assume

that the testator believed from what he had actually given the son, loaned to him and sold to him, when considered with relation to all the surrounding circumstances and in connection with all that followed, that he had helped the son to get a start in life and that such start was a help and worth much to the son; and, when thus viewing the situation of David Diggins, at the same time keeping in mind the fact that the record discloses that the father was not mistaken when he spoke of the value of the property possessed by the son, the conclusion follows that the testator was not laboring under a delusion which affected any of the provisions of the will: *Fulton* v. *Freeland*, 219 Mo. 494, 517 (118 S. W. 12, 18, 131 Am. St. Rep. 576); *Jackson* v. *Hardin*, 83 Mo. 175, 183; *Hall* v. *Perry*, 87 Me. 569 (33 Atl. 160, 47 Am. St. Rep. 352, 358).

It is true that the terms of the will fitted the position in which Charles Diggins was placed more closely than that of Leroy G. Isley. The nephew was younger than the stepson, who at the time of the execution of the will was nearly 21 years of age. Leroy G. Isley lived with his mother and stepfather, while they were living together, until about 1909, when he engaged in farming and stock-raising, and was so employed in March, 1912. It must be remembered, however, that Leroy G. Isley had been practically raised by David Diggins, and that the stepfather always thought a great deal of the stepson, spoke highly of him, and when conferring with his attorney about the disposition of his property, the testator stated that "he had a stepson that he had brought up himself, and he wanted to take care of him," while there is nothing to indicate that the deceased was particularly interested in Charles Diggins.

Much was claimed for what Thomas L. Diggins testified about what his father said concerning a check and Wes Isley. The statement was made, however, only a few days before the death of David Diggins, during the 10-day period when, according to the testimony of Dr. J. H. Thompson, he was not competent to transact business, and on an occasion when Thomas L. Diggins says he—

"found father out of his head. He did not know me when I first went in. He just looked up. I laid my had [hat] down and was there a few minutes, and he looked up and apparently knew me."

The record pictures an old man who was childish, whose menory was failing, and who was weakened by the infirmities of advanced age, but who, nevertheless, was firm in his convictions, and when he made his will understood the business in which he was engaged, had a knowledge of his property, and knew how he wished to dispose of it among those entitled to his bounty. The disputed writing reflects the deliberately expressed and carefully considered wishes of the testator unaffected by the wishes or influence of any other persons. The standard by which to measure the validity of the disputed writing is not what disposition of the property would have been made by most persons, or even by some others, but the test is as hereinbefore stated.

The decree of the Circuit Court is affirmed.

AFFIRMED.