ESTATE of Henry BURRIS, Deceased.

Martha B. WHELAN, Petitioner and Respondent

v.

Henry J. BURRIS, Thomas Burris, Frances Albert Burris, William Burris, Wallace J. Burris, Sterling A. Walker, Special Administrator of the Estate of Leo Burris, Deceased, Mildred McCann, Gertrude Narlock, Loren Burris, Gerald Burris, and Henry Burris, St. Mark's Church of Conway, North Dakota, Respondents and Appellants.

No. 7487.

Supreme Court of North Dakota.

Oct. 26, 1955.

Rehearing Denied Nov. 22, 1955.

Day, Stokes, Vaaler, Gillig, Grand Forks, F. Lorene Whitesides, Park River, for respondents and appellants.

Philip R. Bangs, Grand Forks, for petitioner and respondent.

SATHRE, Justice.

This is a will contest in which the validity of an instrument purporting to be the last will and testament of Henry Burris deceased is involved. The proponent of the will Martha B. Whelan is the daughter of the testator and is the sole beneficiary under the terms of the will and nominated as executrix thereof. The contestants are seven sons of the testator and the children of two deceased sons. The will was admitted to probate in the county court of Grand Forks County, North Dakota, upon petition by the proponent Martha B. Whelan who was also appointed executrix of the will.

The contestants filed objections to the admission of the will to probate on the following grounds:

1. That it is signed by the testator using a mark.

2. That its provisions were induced by undue influence exercised on the testator by the proponent; and

3. That the terms of the will are unnatural.

The county court made its order admitting the will to probate and appointing the proponent as executrix thereof.

The contestants appealed from the order of the county court to the district court of Grand Forks County. The case was tried to the court and a jury. The jury returned a verdict that the will was invalid, and that it was not the will of the testator Henry Burris and judgment was entered upon the verdict. Thereafter the proponent made a motion for judgment notwithstanding the verdict which was thereafter granted by the district court. The contestants appealed from the order of the district court granting proponent's motion for judgment notwithstanding the verdict and from the order vacating the judgment entered upon the verdict.

It is contended by the contestants, first that the will was not subscribed and executed as provided by law, that the testator signed by mark instead of subscribing his name thereto. Second that the will was the result of undue influence exercised upon him by his daughter Martha the proponent of the will and sole beneficiary thereof.

The record shows that testator was one of the early settlers in Walsh County having arrived in the vicinity of the town of Conway in 1882. He was engaged in farming and lived on his farm or in a home in Conway until 1948. During that time he had acquired five quarter sections of land and had accumulated a considerable amount of personal property consisting of cash, bonds, and stocks.

His wife died in 1933 and from that time until 1948 he lived more or less alone. A son, Will Burris, who was unmarried, spent considerable time with his father during that time. In 1948 the testator had a stroke which resulted in paralysis of his left side, and from that time on he was unable to take care of himself.

Martha B. Whelan daughter of the testator and the proponent of the will had left home before the death of her mother in 1933 and was employed for some time in a bank at Grafton, North Dakota. Thereafter she left the state and went to the state of New York where she was married and established her home. A son of the testator, Charlie Burris, also lived in New York. Upon hearing of his father's illness he came back to visit him. Money for transportation by plane was sent to the daughter Martha B. Whelan and she together with the wife of Charlie Burris went by plane to the home of her father at Conway, North Dakota. Martha B. Whelan arrived in Conway in November 1948. Arrangements were then made that she was to take care of her father at his home in Conway and that she was to receive $35 per week for her services.

She stayed with her father at Conway and took care of him until September 1949 when they moved to the City of Grand Forks where they lived until her father's death June 25, 1951. They rented a house known in the record as the Fladeland house. They lived in the Fladeland house until some time in the summer of 1950 when they moved to a house at 719 Maple Avenue. They continued to live at the Maple Avenue house for some time after which they moved to a house owned by one Jane Malone located at 1629–6th Avenue North, Grand Forks, North Dakota. While the testator and his daughter Martha were living in Grand Forks, Martha's husband and son Joe were also living with them. The will of the testator which is the subject of this contest was executed on November 22nd, 1950 at the house located at Maple Avenue. It was prepared by W. T. DePuy a lawyer at Grafton, North Dakota. Mr. DePuy testifying for the proponent, stated that shortly before November 22nd, 1950 he received a telephone call, evidently from Martha B. Whelan, stating that her father wanted to see him. He happened to see Martha Whelan personally on November

21st the day before the execution of the will at which time he was told by her that her father wanted to see him. He drove to Grand Forks in the afternoon of November 22, 1950. He stopped at the Ryan hotel and made some telephone calls after which he drove to the house on Maple Avenue North. After arriving at the Maple Avenue house he called Dr. Leigh of Grand Forks requesting him to come to the home of the testator. He had previously called C. F. Peterson of Grand Forks, a lawyer, requesting him to come to the home of the testator. C. F. Peterson and one Charles H. Fee arrived at the Maple Avenue house shortly after the arrival of Mr. DePuy and Dr. Leigh arrived a few minutes later. These four men DePuy, Peterson, Fee and Dr. Leigh then went into the bedroom of the testator, Henry Burris and Mr. Peterson closed the bedroom door. They visited with the testator for a few minutes and then Mr. DePuy asked him what he wished him to do. He replied that he wished to make a will and wanted Mr. DePuy to prepare it for him. Mr. DePuy had with him a blank legal form and a scratch pad. He made notations on his scratch pad of the instructions and directions given by the testator. Thereafter he prepared the will in his handwriting in accordance with the instructions given by the testator. The testator gave the legal descriptions of the real property owned by him and he also gave the names of all of his children and of his grandchildren. The will provided first, for the payment of all of his funeral expenses and all of his debts. It next provided for a bequest of $50 to St. Marks Church, Conway, North Dakota for the repose of the souls of himself and deceased relatives. The will then provided as follows:

"I give, devise, and bequeath to my daughter, Martha B. Whelan, all of the residue of my property, both real and personal, of every name, nature and description and wherever situated to have and to hold the same to said Martha B. Whelan forever. I further direct that included in my estate shall be included the indebtedness of my sons to me in the following amounts to-wit:"

Then follow the names of the sons and the amount that each one owed him. The will provided further:

"I deliberately omit to provide for my sons, Thomas Burris, Henry J. Burris, Frances Albert Burris, William Burris, Wallace J. Burris, and Leo Burris and for my grandchildren Mildred McCann, Gertrude Narlock, Loren Burris, Gerald Burris and Henry Burris."

Then follows the nomination and appointment of Martha B. Whelan to be the executrix of the last will and testament, "revoking all former wills I made, she to serve without bond."

After the will was prepared Mr. DePuy read it to the testator and the testator declared to the witnesses that it was his last will and requested them to sign the same as witnesses thereto. At the time that the will was prepared the testator was sitting up in bed propped up by pillows behind his back. When the will was prepared and had been read to the testator, Mr. DePuy placed the scratch pad in front of him and he attempted to sign his name thereon, but his left side was paralyzed and because of extreme tremor in his right hand he was unable to write his name legibly. The will was then placed in front of him and he drew a mark diagonally with a pen; the position of the will was then changed and he drew another line diagonally resulting in a cross. Mr. DePuy then signed his name as witness to the mark of the testator. All four of the men, that is DePuy, Fee, Peterson and Dr. Leigh signed the will as witnesses at the request of the testator in his presence and in the presence of each other. The testimony of Charles Fee and C. F. Peterson, testifying as witnesses for the proponent, was to the same effect as the testimony given by Mr. DePuy. They stated that the will was read to the testator by Mr. DePuy and that he declared that it was his last will and testament and requested them to sign as witnesses thereto

and that they signed it in his presence and in the presence of the other witnesses. Dr. Leigh testified that he was a medical doctor residing at Grand Forks and that he had resided there for several years. He stated that he knew the testator Henry Burris in his life time and that he took care of him on several occasions before entering the navy; that he was present in the bedroom where the will of the testator was executed and that he signed his name as witness thereto; that he was in the room and saw Mr. Burris sign the instrument by mark. He was asked whether or not, the testator at the time he placed his mark on that instrument, was mentally competent to which Dr. Leigh replied that in his opinion he was mentally competent. Dr. Leigh stated further that at the time the will was executed the left side of the testator was completely paralyzed and that he was unable to use his left hand; that he had a very severe tremor of his right hand; that he had an object in his hand which he thought was a pipe but that it was difficult for him to get it to his mouth. His tremor was very severe and he was unable to control his hand with any accuracy. On cross examination Dr. Leigh stated that he had called on Henry Burris, the testator, twice on November 22nd the day of the execution of the will. We quote from his testimony:

"Q. So you saw Henry Burris twice on the 22nd day of November? A. Yes.

"Q. And you didn't see Henry Burris then again until March first, 1951? A. That is right.

"Q. So when you saw Henry Burris on that day, what was his physical condition as far as his health was concerned? He was not a sick man? A. Sickness is relative, of course. He was sick with old age.

"Q. And as far as your observation there his condition was that—he was 91 years old at that time, he was an old man? A. Yes, he was that." The proponent then rested.

Section 56–0302, NDRC 1943 provides how wills must be executed and attested. It reads as follows:

"Every will, other than an olographic will and a nuncupative will, must be executed and attested as follows:

"1. It must be subscribed at the end thereof by the testator himself, or some person, in his presence, and by his direction, must subscribe his name thereto;

"2. It must be subscribed in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority;

"3. The testator, at the time of subscribing or acknowledging the same, must declare to the attesting witnesses that the instrument is his will;

"4. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request, and in his presence;

"5. A witness to a written will must write, with his name, his place of residence; and

"6. A person who subscribes a testator's name by his direction must write his own name as a witness to the will. A violation of this subsection does not affect the validity of the will."

Subdivision 4 of Section 1–0149, NDRC 1943 provides:

"'Signature' or 'subscription' shall include 'mark' when the person cannot write, his name being written near it and written by a person who writes his own name as a witness."

Section 7309, Compiled Laws of 1913 (now Section 1–0149) was considered by this court in the case of In re McKee's Estate, 72 N.D. 86, 4 N.W.2d 652, 656. In that case it said:

"It seems to us that when that portion of Section 7309 with which we are here concerned was enacted, its purpose was to safeguard signatures by mark. It made a signature by mark thus witnessed prima facie of the same worth as a signature by writing. But it did not exclude other proof of a signature by mark alone. So, where a will or other writing is offered and the signature thereto is by mark, witnessed as provided in the statute, no further proof is required that the mark is the maker's signature unless that fact is challenged."

We think therefore that the signature by Henry Burris, by mark was sufficient to comply with the requirements of the statute. We are also of the opinion that in other respects the execution of the will complied with the formal requirements of Section 56-0302 quoted herein. No question was raised by the contestants as to the testamentary capacity of the testator.

The only issue submitted to the jury by the trial court was therefore whether or not the will of Henry Burris was the result of undue influence exerted upon him by Martha B. Whelan, the sole beneficiary thereunder. The jury found that the will was invalid and the result of such undue influence. Proponent made a motion for judgment notwithstanding the verdict. The motion was granted and the trial court held, as a matter of law that the evidence was insufficient to establish undue influence by the proponent and judgment holding the will valid was entered accordingly. The only question for determination is therefore whether the evidence was sufficient to raise an issue of fact for submission to the jury on the question of undue influence. The general rule is that the elements necessary to be established to warrant the rejection of a will on the ground of undue influence are:

1. That the testator was subject to such influence;

2. That the opportunity to exercise it existed;

3. That there was a disposition to exercise it, and

4. That the result appears to be the effect of such influence.

The proponent having established a prima facie case the burden was on the contestants to establish by a preponderance of the evidence each of the four elements stated above. Suspicion or supposition of undue influence is not sufficient to require the submission of the question to a jury or to sustain a verdict. In re Estate of Bayer, 119 Neb. 191, 227 N.W. 928; In re Estate of Bainbridge, 151 Neb. 142, 36 N.W.2d 625.

In order to determine the questions thus raised it will be necessary to review the testimony of the witnesses, somewhat in detail. The record is voluminous, the trial in district court having consumed twelve days. More than twenty witnesses testified in the case and a large number of exhibits of different types and character were introduced in evidence.

The proponent, Martha B. Whelan was called by contestants for cross examination under the statute. She stated that when she came to take care of her father in September 1948 her father had five quarter sections of land, some bonds, mortgages and cash; that he also had a house in the town of Conway which was his only home. She stated that she lived with her father at Conway and took care of him there until the fall of 1949; that while living at Conway one Mrs. Stringem was employed to assist her in taking care of her father, and she also employed a Mrs. Sindal Brown. In September 1949 she moved with her father to the city of Grand Forks and rented a house known in the record as the Fladeland house paying rent at $125 per month. They lived there until July 1950 when they moved to a house at 719 Maple Avenue where the will of Henry Burris was prepared and executed November 22, 1950. In the fall of 1949 her father gave

her a deed to the home at Conway. She stated that her brothers Leo and Will would come to the Fladeland house and when they came there were trouble and arguments.

Jane Malone, a witness for the contestants testified in substance as follows: She was a registered nurse and was employed by Martha B. Whelan to take care of the testator after he was moved to Grand Forks; that she started her employment September 1, 1950 and continued in the employment until the death of the testator on June 25, 1951. She would come to the home of the testator upon telephone calls from Mrs. Whelan,—usually between 9 and 9:30 in the morning. When she first went there she stayed a whole week, and after that her employment averaged four or five days a week. She stated that the testator's condition was good for a man of his age, but his eyesight was poor and his hearing was impaired. When she arrived in the morning she gave him his breakfast and otherwise took care of him, as he was unable to leave the bed. Mrs. Whelan (Martha) was away the first week that Miss Malone was employed, which would be the first week in September 1950. After the return of Mrs. Martha Whelan the witness heard many conversations between Mr. and Mrs. Whelan and their son Jr., and the conversations had to do with the property or estate of Henry Burris the testator. The first of these conversations took place in the Fladeland house. Sometimes the conversations were had in the presence of the testator and sometimes just between themselves. The witness was asked: "Will you state to the court and jury what this conversation was? A. Well, she said her father had given so much money to her brothers and she had not received any money, only her salary and she thought she should have a right to whatever money her father had, and property."

With reference to a subsequent conversation between Martha Whelan and Miss Malone, Martha said she had not received any money from her father, and she had been living away from here and she thought it was time she received some money.

Miss Malone testified further:

"Q. Did you hear her (Martha Whelan) state or talk to her father on several occasions during the time that they were at the Maple house? A. Yes. (Objected to as repetition. She has said that. She has answered.)

"Q. Will you state to the court and jury what you heard Martha Whelan tell her father? A. She told him that he should have an attorney come and make a will and provide for her.

"Q. Did you hear her make any statement as to what the will should contain, what should be in the will? A. Yes.

"Q. Tell the court and jury in your own words what you heard Martha Whelan say to her father?

"Mr. Bangs. If you could fix the time more definite I would appreciate it.

"Mr. Stokes. Within a period of three weeks. There were several conversations during that period of three weeks.

"Mr. Bangs. Is that what Mrs. Whelan said?

"Mr. Stokes. Yes.

"Mr. Bangs. How long before? Can't we get it fixed?

"Mr. Stokes. Q. Did you hear any conversation like that the day before or the day on which the will was made? A. I won't say that, the day before.

"Q. You say you heard it the day before? A. Yes.

"Q. And would you state what you heard Martha Whelan say to her father the day before? That would be the 21st day of November. A. Well, she told him that the men were coming there, named them, and said there is

going to be a will made providing for her.

"Q. Did you overhear Henry Burris say anything during the conversation? A. Well, I don't remember.

"Q. This conversation took place on the 21st. Did you hear any conversation on any day prior to the 21st? A. Yes.

"Q. With repect to the will between Martha Whelan and Henry Burris? Yes.

"Q. And would you state to the court and jury as near as—can you give any particular date or approximate date prior to the 21st on which you heard this further conversation? A. There was some conversation every day for at least two weeks before the 22nd.

"Q. Will you state to the court as nearly as you can in substance what that conversation was? A. Practically the same, there must be a will made providing for her.

"Q. Now did you ever at any time hear Martha Whelan make any statement to her father about her brothers? A. Yes.

"Q. And where were those statements made, at what house? A. At all the houses they ever lived in that I was with them.

"Q. And so that you heard her make statements to her father concerning her brothers while they were living at the Fladeland house in September and October? A. Yes.

"Q. Is there any particular date or any particular time you can set as to any particular conversation of this nature occurred? A. I could not set any date.

"Q. Was the statement that she made to her father about her brothers different on different occasions or was it generally of the same nature every time you heard it? A. Generally of the same nature.

"Q. Would you state to the court and jury what you heard Martha Whelan tell her father or to her father about her brothers? A. Well, she said they didn't care anything about him and they didn't come to see him, and they had got all the money they could from him and that they didn't care about it. That was about it.

"Q. Did she say anything to her father at any time about these guardianship proceedings? A. Oh, yes, she told him about it.

"Q. And did she say anything to her father in connection with those as to what the boys were trying to do or trying not to do? A. She did say that they were trying to put him in an old people's home or guest home.

Miss Malone testified further that she came to the Maple street house on the morning of November 22, 1950 at about 9 or 9:30 in the morning; that she gave the testator his breakfast, and she also gave him an eggnog with whiskey or brandy in it, and that Martha Whelan said that the eggnog would make her father feel better, better able to make the will.

Louis Leff testifying for the contestants stated that he had been county judge of Walsh County from 1941 to 1953; that he was acquainted with Henry Burris the testator and had known him for twenty years or more; that between June 1st and June 13th, 1950 he called on Mr. Burris the testator in connection with certain guardian proceedings in his court commenced for the purpose of appointing a guardian for said Henry Burris; that he made another call on the testator on or about June 29, 1950 at Grand Forks; Martha B. Whelan, the proponent of the will was present in the room with Mr. Burris and the witness when he called; that he discussed with Henry Burris his business affairs; that every time he asked Mr. Burris a question Martha, his daughter, would answer for him. We quote from his testimony:

"The Court: State what you saw or what Mrs. Whelan said. A. Mrs. Whelan said that the guardianship or trusteeship was not necessary, because she was—she had power of attorney from him and she was taking care of his property and business, and he was very, very well satisfied. That is what she said, and that is what he said.

"Miss Whitesides: Q. Can you think of anything else that she said or he said? A. She also stated that she had never received any money or property from her father, and that the sons of Mr. Burris, or her brothers, had already received their shares from advances and it was about high time she was receiving something herself.

"Q. Can you think of anything else, Mr. Leff, that was said or Mr. Burris said? A. I suggested to Mr. Burris and I told Mr. Burris that he should go to a hospital, that his expenses would be cheaper than being taken care of in a private home as he had then, if he kept on the present rate of expenditures that in spite of his property holdings he would end up a pauper and be a county welfare case."

Harry Burris testifying for contestants stated that he was a son of the testator, and a brother of Martha B. Whelan; that he lived in Lethbridge, Alberta, Canada, having moved to Canada in 1944. He came back to North Dakota in the fall of 1950, which would be his third trip to visit his father since he moved to Lethbridge. He arrived at the home of his brother Leo November 16, 1950. On November 18th following he went to Grand Forks and called on his father Henry Burris. He said his father was old and weak, he was hard of hearing and his eyesight was poor. His sister Martha Whelan was not at home that day. He and his father talked about his father's business and his father said: "Well, I guess I will have to change my will; some of them are not satisfied". He, Harry, replied: "I said that he already

made a will, let us talk about old times." He next saw him the following day, Sunday in the afternoon and stayed until about ten that evening. He stated that he had several conversations with his sister Martha that afternoon about their father's affairs. He was asked by counsel "remember some of the things you said and some of the things Mrs. Whelan said?

"A. Well, I said several times, I said it more than once, to let us get guardians appointed for Dad's estate. And after that, I told her, pointed out to her, I said that she would not have to worry about the money, she would get her money and the bills would be paid. And I don't know of anything more I can say. That was just a repetition of a lot of that stuff. We talked all the afternoon."

He did not return to Canada until December 12, 1950, and during his stay he visited his father several times.

Mrs. Rose Burris, wife of testator's son Tom testified that she married Tom in 1921; that their home was in Kolin, Montana and that they had lived there since 1921; that she had known her father-in-law, the testator, since 1920; prior to 1939 they lived at Conway, North Dakota; she and her husband had visited her father-in-law, Henry Burris once every year since they moved to Montana; in 1948 the testator came to Montana and visited with them a month, and she brought him back to Conway. She and her husband took him to Canada where he celebrated his 89th or 90th birthday. She and her husband came to Grand Forks for testator's funeral. During the time they were at Grand Forks for testator's funeral she had a conversation with Martha B. Whelan concerning testator's property. We quote from her testimony.

"Q. During the time that you were here for Mr. Burris' funeral, did you have any discussion with Martha Whelan concerning Mr. Burris' property? A. Yes.

"Q. Where did you have that dis-. cussion? A. In front of the undertaking parlor, Norman's.

"Q. Where? A. In Grand Forks.

"Q. And who was present at that time? A. Just her and I.

"Miss Whitesides: Q. Mrs. Burris, did you have a conversation with Mrs. Whelan? A. Yes.

"Miss Whitesides: Q. Mrs. Burris, state it as nearly in the words of Mrs. Whelan or yourself as possible. A. She said she didn't like the way the boys were treating her, and that Harry had come down here from Canada and talked about her. And I said I didn't blame the boys, because I knew how Grandpa always felt about his property and how careful he was and it was taking too much money to keep him in Grand Forks. And she said DePuy had told her that him and her were doing just exactly as the boys would have done."

The witness stated further that she and her husband came to Conway in 1949, and they came to Grand Forks in March 1950 and visited her father-in-law the testator.

Mr. Ted McCann testified for contestants that he married a niece of the testator in 1941 and knew him since that time. He knew that testator moved to Grand Forks in the fall of 1949, that he and his wife visited testator in March 1950. Martha Whelan and her husband were there at that time. He visited the testator and had a conversation with him at that time. We quote from his testimony.

"Miss Whitesides: Q. Did you have a conversation with Mr. Burris at the time you were at the Fladeland house in March 1950? A. Yes.

"Q. And will you state Mr. Burris's exact words as near as you can remember? A. The conversation him and I had?

"Q. Yes. A. Well, when I went in there he said 'You know, Ted, I

should be declared incompetent. I am not capable of taking care of my affairs.' And he talked for a little while and he said 'Would you look after my affairs?' And I said 'No I would rather not.' And he stopped and he said, 'I don't blame you'. Then he asked me if I knew anyone I thought he could get and I told him I thought he might be able to get John Kennedy, as he was a relation of his, that he might be able to look after his affairs. Then he asked me if I would see John Kennedy, and I said, Yes, I would. Then as I left the house, or left the room, I went in and told Mrs. Whelan that he wanted me to see John Kennedy, and I didn't care much about seeing him, and she said she would send him a post card. And I didn't talk to John Kennedy at all about it."

Mrs. Lorene McCann wife of Ted McCann testified that she was with her husband at the visit to the testator in March 1950, that she was in the kitchen and that she heard the conversation between the testator and her husband, and that Martha Whelan was back and forth between testator's bedroom and the kitchen.

Will Burris, a son of testator testified in substance as follows: He was born on his father's farm at Conway; that his father lived on his farm near Conway or in Conway until he moved to Grand Forks in the fall of 1949. He said his father's health was poor, he was blind in one eye and his hearing was impaired. He could not get around and had to be lifted every place, and he was moved to Grand Forks in the fall of 1949 where his daughter Martha and her husband and her son lived with him. While testator was at Conway $1,000 of his money was placed in the bank subject to check by Will Burris and his brother Leo for the purpose of paying the expenses of taking care of their father. The money was put in the bank in the fall of 1948 and it was all spent by March 1949. At or about the time that they were moving testator to Grand Forks some discussion was had between Will and Leo Burris and Martha Whelan as to signing of the checks

on the said $1,000 but Mrs. Martha Whelan did not agree that Will and Leo should sign them.

Will Burris testified that when Leo and he called on their father in March 1950 at Grand Forks, Mrs. Martha Whelan was present; Will and Leo went into their father's bedroom and that "he was kind of sleeping". They woke him up and asked him "how he was" and about the first thing he said, "Leo, I want you and Will to look after my farm up there" and Mrs. Whelan said "you are not looking after the farm, we are looking after that farm". Leo asked his father, "Do you know your taxes are not paid this year"? "Do you know the money is gone for the crop?" and he said they figured it at $3,500. Leo then asked Mrs. Whelan (Martha) "Didn't my father have some bonds" and Leo said "I believe it was around $3000.00 worth of bonds. Where are they?" Mrs. Whelan said they are sold, she had to sell them. Well, Leo told Mrs. Whelan, he said "My father had about $2100.00 work of A. T. & T. stock, where is that". "She said that is sold too". He quoted Mrs. Whelan as saying that she should have money; she did not know where it was coming from, and that she should get more than the boys. In his conversation with his father, the testator, he quoted him as having said that Martha Whelan was driving him crazy asking for money. Will's argument with Mrs. Whelan ended by his statement that he would never come back to the house as long as the Whelans were there.

John Kennedy, residing at Minto, North Dakota, testifying for contestants stated he had known Henry Burris, the testator a long time, that he was testator's nephew; and had visited with him on numerous occasions at Conway. He visited with the testator at the Fladeland house in Grand Forks in April 1950, he was shown defendants' exhibit C, previously admitted in evidence, which was a codicil executed by testator; he was present and saw the exhibit signed by the testator, and the testator said he wanted the witness, Kennedy, his son Harry and Marta Whelan to be executors. Mr. DePuy, Martha Whelan and the witness were in the room with testator at that time.

Mr. Kennedy testified further that on or about the month of October, 1949, at Conway, North Dakota, the testator Henry Burris, said that "he had his business affairs straightened up, and that for sentimental reasons it might be that they would wish to keep the homestead, the Burris farm, in the name of the Burrises, and he had stipulated that Will Burris, be given the privilege of purchasing the farm if he so desired." We quote from the testimony:

"Q. Did he say anything else at that time that you remember? A. Yes, he said that the balance of it would be equally distributed. Could I make a correction of that, Mr. Bangs?

"Mr. Bangs: Surely. A. When I made reference to the balance, the price stipulated was supposed to apply on Will's share."

Mr. Kennedy testified further that he had a conversation with the testator at the Fladeland house in Grand Forks in the latter part of October 1949 as follows:

"Q. Will you state to the court and jury as nearly in the words of Henry Burris, what he said at that time? A. Mr. Burris said to me at that time, he said 'John, I am awfully pleased you called, because there is something I wish to discuss with you'. He said 'They are after me here to change my will'. And I told him, I said, 'I thought you had that all taken care of'. And he said, 'I thought I did too, but it don't seem to please them here.' I said, 'My advice to you, Uncle Henry, would be not to do it, because, 'I said, we can't please people while we are living and why be concerned after we are dead.' And he answered—he thought for a moment and he answered, he said, 'John, you know I can't get along without Martha.'"

He stated further that he told Martha Whelan, the proponent that Henry Burris,

made reference to changing a will, and that he, Kennedy, told him not to do so and said to Martha: "I would advise you to do the same because any changes this late date no doubt would be contested". That Martha said: "I don't care whether they do or not providing the boys don't get anything out of it."

Mrs. Martha Whelan was called in rebuttal to testify in her own behalf. Her testimony was in direct conflict with the testimony of the witnesses for contestants with reference to the statements attributed to her regarding the making of her father's will. She denied categorically the testimony of the nurse, Jane Malone, to the effect that she had made any statement with reference to her father changing his will, or listening at the bedroom door when the will was being executed. She denied Miss Malone's testimony that her father was given an eggnog with whiskey and brandy in the morning of the day that the will was executed. She specifically denied that she had made the statements attributed to her by the other witnesses for the contestants as to her unfriendly attitude toward her brothers, or that she had urged or importuned her father to make her the sole beneficiary under his will.

On cross examination she testified that her father had given her all his personal property, and that while she lived with her father at Conway she purchased a car. We quote from his testimony:

"Q. But it was your father's car? A. Yes. He bought it for the use up in Conway, we needed it. We couldn't get meat or anything.

"Q. You have sold that car? A. His personal things were mine.

"Q. Have you anything in writing to show that these personal things were yours? A. Yes. There was an article all his personal property was given to me.

"Q. Have you that article with you? A. I don't have it with me, no.

"Q. That is back in Brooklyn, New York? A. If it is, it will be here with the things, I don't know whether Mr. Du Puy has it.

"Q. The car was your father's but it was in your name? A. It had to be that way, yes, to be safer.

"Q. And you disposed of that car, even though it was your father's car? A. He had given it to me.

"Q. And when did he give it to you? A. He gave me all his personal property.

"Q. When was that? A. Up in Conway.

"Q. In Conway? A. Yes.

"Q. That would be before November 19, 1949? A. Yes, sir."

She further admitted that two days before the execution of the will she induced her father to change his life insurance policy so as to make her the sole beneficiary thereunder.

The testator in the case at bar was an aged man being ninety years old at the time of execution of the will. In the fall of 1948 he had a stroke which resulted in complete paralysis of his left side and inability to use his left hand. He had a severe tremor of his right hand which made it difficult for him to use it. His hearing was impaired and his eyesight was poor and one eye was blind. The stroke made him physically helpless and he required assistance when it became necessary for him to move about in his room. His daughter Martha B. Whelan, the proponent, lived in the state of New York, having left home some twenty years before her father had the stroke. By arrangement with her brother she came to Conway in the fall of 1948 for the purpose of taking care of her father and for which she was to be paid at the rate of $35 per week. On November 7th, 1949 the testator executed three instruments, contestant's exhibits I–2, O–2, and P–2. Exhibit I–2 was a power of attorney to the proponent Mar-

tha B. Whelan. The power of attorney is in the usual form and authorized her to transact all of the business of the testator to the same effect and in the same manner as he could have performed the same himself. Under her power of attorney Martha B. Whelan took full charge of her father's business. She collected his income from his farming operations, cashed all checks, issued all checks in payment of expenses in connection with his business and other expenses as well as expenses in connection with the care and nursing of the testator. She cashed all of his bonds; issued checks on all of his bank balance and sold his A. T. & T. stock. She claimed of course that she did all of this in order to defray expenses in connection with her father's business and in providing him the care necessary for his comfort. Exhibit P–2 is a certified copy of a quit claim deed from testator to Martha B. Whelan. The property conveyed is the home of the testator located in Conway, Walsh County. Exhibit O–2 is a written instrument executed by the testator Henry Burris, wherein he agrees to pay his daughter Martha B. Whelan at the rate of $55 per week for taking care of him and nursing him, and it provides it shall be retroactive to November 2nd, 1948 the day that Martha B. Whelan arrived in Conway, North Dakota.

There were also introduced and admitted in evidence contestants' Exhibits C, and B.

Exhibit C is dated March 29, 1950. It is a codicil executed by the testator Henry Burris to his will dated the 21st day of October, 1947. It provides that,

"Whereas since my son, Charles A. Burris, is now deceased: Now, Therefore, I hereby revoke all and any devises and bequests in said will made to said Charles A. Burris and direct that his heirs shall receive nothing from my estate.

"I further direct and do hereby appoint my daughter Martha Whelan, my friend John Kennedy, to be executors of my last will and testament, to serve without bond.

"In all other respects I confirm my said will. In testimony whereof, I have hereunto subscribed my name the 29th day of March 1950."

The instrument was signed and attested by two witnesses on the 29th day of March 1950.

Exhibit B is dated July 7th, 1950. It was executed by the testator as a codicil to his will, dated the 21st day of October 1947. It provides that,

"Whereas it is my desire that my daughter, Martha Burris Whelan, shall receive the sum of Five Thousand Dollars from my estate in addition to all devises and bequests to her in said will and codicil provided.

"Now, Therefore, I give and bequeath to my daughter, Martha Burris Whelan, the sum of Five Thousand Dollars ($5000.00); the same to be a special bequest having preference over any and all other bequests and devises in said will and codicil made.

"In all other respects, I confirm my said will dated Oct. 21, 1947 and the codicil thereto dated March 29, 1950."

It was signed by mark duly witnessed and attested by two witnesses on the 7th day of July 1950.

We think the evidence is sufficient to raise an inference of susceptibility to undue influence on the part of the testator. He was ninety years old when the will was drawn. Two years previous he had become wholly unable to take care of his physical needs. His statement to Ted McCann in March 1950 that he, the testator, was not capable of taking care of his affairs and that he should be declared incompetent and his request to McCann to look after his affairs; his request to his sons Leo and Will to look after his farm, his remark to his son Will Burris, in March 1950 that his daughter Martha was driving him crazy asking for money would indicate that he was under a severe mental strain which would render him subject to undue influ-

ence. There was abundant opportunity for his daughter Martha to exert it. He was under her constant care and supervision. He had given her a deed to his home in Conway. He had given her a power of attorney to do all his business. He had signed a written agreement a year after she came to Conway, increasing her salary from $35 per week to $55 and making it retroactive to the time of her arrival in the fall of 1948. In March 1950 and July 1950 he executed codicils to his will of October 21, 1947, each of which codicils was favorable to the proponent Martha Whelan. Testator's ill health, his age and senile condition, his residence in Martha's home and the confidential relation existing between them are independent facts permitting an inference that testator was susceptible to undue influence and that Martha Whelan exercised it. We quote from 2 Page on Wills, Lifetime Edition Section 825:

"The fact that testator and beneficiary are members of one household, or that testator lives with the beneficiary to whom he makes such gift, is said not to raise a presumption of undue influence.

"While it is said that such evidence does not of itself tend to prove undue influence, it is said that such fact is admissible in evidence. A presumption or inference of undue influence is said to arise where testator is aged and feeble, leaves the bulk of his property to the children with whom he lives to the exclusion of others for whom he has always manifested affection, or where testator actually reposes trust and confidence in the person with whom he lives."

The two codicils to proponent's will of October 21, 1947 are evidence to the effect that said will was inconsistent with the will of November 22, 1950. The will of October 21, 1947 was executed at a time when testator was free to act by his own volition without the exercise by others of undue influence. The rule in such cases is stated as follows in 57 Am.Jur., Will, Section 409, page 292:

"It is held in most jurisdictions in which the question has arisen that former wills of the testator, executed at a time when undue influence is not charged or does not appear to have been present, which contain provisions inconsistent with those of the will in contest, may be admitted in behalf of the contestant in support of a charge of undue influence. Although it is recognized that the disparity between the earlier will and the will in contest may well depend upon the length of time that elapsed between the execution of the two instruments, changes in conditions, and changes in the attitude of the testator's children or other natural objects of his bounty, the view is that the inconsistency between the wills is one of the circumstances which should be placed before the jury to be accepted by them for what it is worth in the light of all the facts and circumstances in evidence."

Miss Malone testified that Mrs. Whelan told her father the day before the will was made that he should have an attorney come and make a will and provide for her, and that the men were coming there, naming them, and that there was to be a will made providing for her. These were incidents so near in point of time to the date of execution of the will that they could have influenced the mind of the testator. Miss Malone further testified that Martha Whelan had some conversation of this nature with her father every day for at least two weeks before the date of the execution of the Will. While Mrs. Whelan denied that such conversations were had with her father, nevertheless the conflicting testimony raised questions of fact as to undue influence which could be submitted to the jury.

In Demmert v. Schnell, 4 Redf., N.Y., 409, 413, it is stated:

"The rule to be deduced from the decisions on the subject is this: that where a person enfeebled by old age or illness makes a will in favor of another person upon whom he is dependent,

and that will is at variance with a former will made, or intentions formed when his faculties were in their full vigor, and is opposed to the dictates of nature and justice, the presumption is that such a will is the result of undue influence, unless that presumption is satisfactorily rebutted by other evidence in the case."

The question of undue influence was considered by the Supreme Court of Oregon in the case In re Lobb's Will, 177 Or. 162, 160 P.2d 295, 304. We quote from the opinion:

"This court has held that undue influence, to be sufficient to cause a will to be set aside, must have been such as to have overcome the free volition or conscious judgment of the testator, and to have become the efficient cause without which the will would not have been made. In re Holman's Will, 42 Or. 345, 70 P. 908; In re Diggins' Estate, 76 Or. 341, 149 P. 73. The fact that a confidential relationship existed between testator and beneficiary is not, in itself, sufficient to vitiate a will, in the absence of evidence indicating that the beneficiary exercised undue influence. In re Turner's Will, 51 Or. 1, 93 P. 461. However, where a confidential relationship is shown to have existed, and the will is inconsistent with the claims of duty and affection, slight evidence that the beneficiary abused the testator's confidence is sufficient to invalidate it. In re De Haas' Will, 135 Or. 392, 296 P. 42."

It appears from the record that prior to the fall of 1948 when the proponent Martha Whelan came to Conway to take care of her father she had been absent from the state for more than twenty years. There is no evidence in the record of any intimate relationship between her and her father during such absence. The evidence would indicate that from the time she arrived in Conway she assumed a rather dominant attitude towards her father and in the management of his business affairs, and

this attitude seems to have existed up to the time of the execution of the will.

With reference to her brothers there is nothing in the record to indicate that the relationship between them and their father was anything but friendly and congenial. The relationship between them appeared to be the normal attitude of mutual friendliness and devotion between a father and his children. There is no evidence in the record of any disagreement at anytime between the testator and the sons who are the contestants in this action.

It is true that a person has the right to change his mind with respect to the disposition of his property, by will or otherwise; however, where as in this case, the will disinherits all of his sons without any apparent reason and designates as his sole beneficiary his daughter with whom he had lived for two years prior to the making of the will, and during which time he had been under her constant domination such as is evident in the instant case, the situation requires strict scrutiny by the courts. In re Olson's Estate, 227 Minn. 289, 35 N.W.2d 439, 445, the Supreme Court of Minnesota quoted with approval the following from Swenarton v. Hancock, 9 Abb.N.C. 326, 362:

"'Every testator has, of course, the right to change radically, and even arbitrarily, the manner of disposing of his property; and, in the absence of fraud or imposition, courts will sustain his action in this respect. But when it has been found that an unnatural change has been made in a sick man's will, and one apparently contrary to his previous fixed and determined purpose, it is the duty of the courts to scrutinize closely the circumstances, with a view of ascertaining whether the act was free, voluntary and intelligent, or whether it was a substitution of the volition and interest of another, who by some irresistible influence secured the change.'"

After a careful consideration of the lengthy record and all of the facts and circumstances in the case, the advanced age

and senile condition of the testator, his physical ailments which undoubtedly affected the independent exercise of his judgment; the fact that he was under the constant care and supervision of Martha Whelan for two years immediately prior to the execution of the will, and her opportunity to exert pressure upon him to make her the sole beneficiary of his will; the fact that on Thursday preceding the date of the execution of the will she induced him to change a life insurance policy so as to make her the beneficiary thereunder; that he disinherited his eight sons and the children of a deceased son, and further provided that any and all advances made to his sons in his lifetime should be repaid to his estate which would thus become the property of Martha B. Whelan, the sole beneficiary under the will,—we have concluded that there was an issue of fact as to whether at the time of the execution of the will the testator was a free agent or was acting under influence that had been exerted upon him by his daughter Martha B. Whelan the proponent of the will. The jury found that the purported will was not the will of Henry Burris. We are of the opinion that the evidence is sufficient to support the verdict and that it should not be disturbed.

The judgment is reversed and the case remanded to the district court with directions to reinstate the verdict and the judgment entered thereon.

BURKE, C. J., and MORRIS, GRIMSON and JOHNSON, JJ., concur.

On Petition for Rehearing

SATHRE, Judge.

The proponent has petitioned for a rehearing. She asserts that she made a motion in the district court for judgment notwithstanding the verdict or in the alternative for a new trial. The motion for judgment notwithstanding the verdict was granted. That left undetermined the motion for a new trial. Under the rules announced in several decisions of this court the right of the proponent to move for a new trial in the district court still remains. Nelson v. Grondahl, 13 N.D. 363, 100 N.W. 1093; La Bree v. Dakota Tractor & Equipment Co., 69 N.D. 561, 288 N.W. 476; Smith v. Knutson, 76 N.D. 375, 36 N.W.2d 323. Accordingly leave is granted proponent to renew her motion for a new trial, such motion to be made within thirty days from the date of filing remittitur herein. If such motion is not made, judgment is directed to be entered for contestants in accordance with the original opinion herein.

Rehearing denied.

BURKE, C. J., and MORRIS, GRIMSON and JOHNSON, JJ.